Nnamdi Gregory OFFOR, Appellant,

v.

The STATE of Texas, Appellee.

No. 3–86–250–CR.

Court of Appeals of Texas, Austin.

May 11, 1988.

Leonard Martinez, Austin, for appellant.

Ronald Earle, Dist. Atty., Carl Bryan Case, Asst. Dist. Atty., Austin, for appellee.

Before POWERS, BRADY and CARROLL, JJ.

POWERS, Justice.

A jury found Nnamdi Offor guilty of aggravated sexual assault of a child and assessed punishment of 85 years imprisonment. The trial court adjudged him guilty and sentenced him accordingly. 1983 Tex. Gen.Laws, ch. 977, § 3, at 5312; 1985 Tex. Gen.Laws, ch. 557, § 1, at 4356 [Tex.Pen. Code §§ 22.011(a)(2)(A), 22.021(a)(5) ]. We will affirm the judgment.

## I.

Over Offor's objection, the State was permitted to introduce in evidence the child's videotaped testimony describing the alleged assault. Offor complains on appeal, as he did at trial, that he was thereby deprived of his constitutional rights of confrontation, due process of law, and due course of law. U.S. Const. amends. V, VI, XIV; Tex. Const.Ann. art. I, § 19; *Long v. State*, 742 S.W.2d 302 (Tex.Cr.App.1987). In light of the *Long* decision, we must determine whether the error requires a reversal of the judgment below.

### Standard of Appellate Review

■ The Court of Criminal Appeals recently instructed that the question of the "harmfulness of the introduction of the videotape" must be determined "in light of the entire record of the trial." *Clark v. State*, No. 612–87, Tex.Cr.App., December 16, 1987 (not yet reported). The holding thus implies that the introduction of videotaped testimony, over objection, is not harmful *per se*. The ultimate issue is, rather, whether the entire record shows a reasonable probability that the videotape contributed to Offor's conviction, considering its probable impact on the minds of average jurors. Tex.R.App.P. Ann. 81(b)(2) (Pamp.1988); *Graham v. State*, 710 S.W.2d 588 (Tex.Cr.App.1986); *Gauldin v. State*, 683 S.W.2d 411 (Tex.Cr. App.1984); *see also* 3 LaFave & Israel, Criminal Procedure § 26.6(e), at 278 (1984).

### Summary of the Trial Record

The State averred in the indictment that Offor, on or about May 4, 1986, penetrated with his sexual organ the sexual organ and anus of his stepdaughter, who was at the time younger than age 14. (The evidence

showed that she was 10 years of age at the time of the alleged offense.) The State thus charged the offense and elements set forth in Tex.Pen.Code § 22.011(a)(2)(A) and § 22.021(a)(1)(B)(i), then in effect. Offor pleaded not guilty.

The child was physically present immediately outside the courtroom, available for examination or cross-examination, during the course of the trial. There was evidence, however, that she did not want to give testimony and other evidence that her emotional state might preclude her doing so. In any case, neither the State nor Offor called the child to give testimony.

At the beginning of the trial and before introducing any other evidence, the State was permitted to introduce over Offor's objection the videotape in question. In the film, the child described the alleged assault in answers to questions put to her by a police officer and in her use of anatomically correct dolls for illustration. The child's demeanor on the tape showed only a semblance of embarrassment or nervousness and she gave her description of the alleged assault in a matter-of-fact manner.

Subsequently, several witnesses testified: the child's school teacher and school nurse, the first adults to whom the child reported the alleged assault; a physician, Dr. Beth Nauert, who examined the child a few days after the alleged assault; and a caseworker, employed by the Texas Department of Human Services, to whom the child was referred after she reported the alleged assault to her teacher and school nurse. These witnesses related in their testimony what the child had told them in her "outcry" about the alleged assault.[1]

The teacher testified that the child appeared very agitated in class on a Monday afternoon and began to cry uncontrollably at her desk, saying repeatedly "I'm going to kill him. I'm going to kill him." When the teacher questioned the child, she explained that, "Last night my daddy had come into my bed and taken my panties off." The child stated, in addition, that Offor had done the same thing since she was three years of age, but she had not reported these events until she was seven. (Subsequent evidence, introduced without objection, showed that the State had previously prosecuted Offor for sexual assault of the child, that he had pleaded guilty to a reduced charge of injury to the child, and that he had received and served a one-year probated sentence.) On hearing these statements, the teacher took the child to the school nurse and remained in the office as the nurse interviewed the child.

In response to the nurse's questions, the child repeated what she had told her teacher and gave certain additional statements. She pointed to her pubic area and related that Offor, her stepfather, "touched" her there and sometimes "hurt" her by his acts in that regard. She stated that her mother was supposed to watch her, implying that her mother distrusted Offor. When told that the nurse would call "Child Welfare," the child reacted by sobbing and crying, "No, no, no, don't call. Don't tell my mama."

The teacher testified that the next day the child was at school and told the teacher that her mother promised to take her to Six Flags if she would say she lied in reporting the alleged assault. The teacher advised the child to tell the truth in any case, to which the child responded, "But if my daddy is taken away, we can't afford to stay in this house, because he makes $600.00, and Mama only makes $100.00—and then we can't live there."

The caseworker testified that she had been given charge of the child's case based

---

1. Offor did not object to this hearsay testimony. The statements appear to have been admissible under several different hearsay exceptions for "res gestae" statements. See, e.g., Tex.R.Cr.Evid. Ann. 803(2) (Pamp.1988) (excited utterance); id. at R. 803(3) (then existing mental, emotional, or physical condition); id. at R. 803(4) (statement for purposes of medical diagnosis or treatment). In any event, we may not deny the probative force of the testimony merely because it contained hearsay. Id. at R. 802 (Pamp.1988). Trial in the present case followed both the effective date of Rule 802 and the decision in *Chambers v. State*, 711 S.W.2d 240, 245 (Tex.Cr.App.1986).

on the school nurse's referral. After the first assault, the child moved in with an "aunt"—actually Offor's sister—and spent the night at Offor's home only occasionally. The second assault allegedly occurred on one of these occasions. Since then, the child has not lived with Offor at all. She lived first with a family friend, who taught at the child's school, then she resided in a succession of foster homes and emergency shelters.

The physician, Dr. Nauert, testified that she examined the child on May 8, 1986, some four days after the alleged assault. Her examination revealed that the child had no appreciable hymen and "a gaping opening to her vagina." In cross-examination, the physician agreed that repeated penetration by any large object could cause this kind of stretching but there was only a slim chance that the gaping vaginal opening was not the result of sexual activity. The physician also discounted the likelihood that the cause of the stretching resulted from the inartful use of a speculum in a previous examination, stating that the stretching was only such as would be produced by a repeated use of an instrument. (The report of a physical examination of the child, some two years before, was introduced in evidence and showed that the child's sexual organ was of normal development at that time.)

In the course of Dr. Nauert's examination, the child described the alleged assault graphically, stating that Offor had threatened to "tell the police" if she told anyone what he had done and that she "would get in trouble" as a result.

Dr. Nauert gave her opinion that the child's physical abnormalities were consistent with the child's explanation of repeated sexual encounters with Offor. Dr. Nauert, who works regularly with sexually abused children, added that the child seemed "remarkably consistent" in her statements—even "[w]hen she repeated herself, she didn't get confused"—and that the details given by the child in her descriptions were such that Dr. Nauert would not expect a child to know them unless she had experienced the things she had described.

The child psychologist testified that he had examined and tested the child in ways that he described. He gave his opinion that the child's disturbed emotional state indicated "inappropriate sexual exposure."

The caseworker testified that the child's mother had stated to the caseworker "that she had put a lock on the child's bedroom door that locked from the inside," thereby assuring that the child "would be okay." The mother stated as well that the child slept in the family home only on weekends, because she lived with the "aunt" during the week, and the mother felt the child to be safe as a result of this arrangement. At trial, however, the mother denied, for the first time, that the child had spent *any* nights in the Offor home since October 1985; and she denied specifically that the child was in the family home on the night of the alleged assault.

The State also called the police officer who had conducted the videotaped interview with the child. He described how the interview was conducted and recorded.

We should at this point make the following observation about the State's evidence: (1) in addition to certain corroborating evidence, the primary proof of the alleged assault was the hearsay statements of the child—presented first in the videotape and second in the testimony of witnesses who related what the child had told them about the alleged assault; (2) Offor objected to the hearsay contained in the videotape but *he did not object* to the hearsay given in the testimony of the witnesses who recounted what the child had told them; and (3) the child's description of the alleged assault, both in the videotape and in her report to the various witnesses, is the same. Bearing these propositions in mind, we turn then to the case made by Offor in defense of the charge contained in the indictment.

As indicated by Offor's evidence, his questioning of the State's witnesses, and

his jury argument, Offor defended basically on the ground that the child was not to be believed in what she said to others. The mother testified that the child customarily exaggerated and lied out of jealousy of her stepfather, arising out of their rivalry for the mother's attentions. She denied that the child had spent even one night in the family home since the preceding October, a statement that a neighbor's testimony contradicted. The mother testified, specifically, that the alleged assault could not have happened because the child was not in the home on the night it allegedly took place. She denied making certain statements, attributed to her in the testimony of other witnesses, that substantiated Offor's culpability both in the present case and in the earlier offense involving the same child.

Offor testified that he pleaded guilty to the earlier offense and accepted probation, not because he was guilty but for other reasons: financial difficulties, fear of a heavier sentence if he contested the case, and a desire not to put his family through the ordeal of a trial. He too denied that the child was in the family home on the night in question, and he denied that he ever had sexual intercourse with the child on any occasion. Nevertheless, his testimony appeared to be contradictory in some respects. Although he testified that the child never displayed any seductive behavior toward him, he also stated that he was once awakened by the child's playing with his penis, at which point she asked him why he did not do to her the same things he did to her mother. His testimony was also contradicted by other witnesses who testified that Offor had told them that the child had solicited sex from him.

### Discussion and Holding

■ We believe the videotape could not have been harmful in the sense that it supplied an additional item of evidence, that was not otherwise before the jury, tending to establish Offor's guilt directly or through its corroborating or enhancing effect on other evidence. The body of evidence outside the videotape was sufficient in our view to permit the trier of fact reasonably to find, beyond a reasonable doubt, that Offor penetrated the child's sexual organ with his own within five years of the indictment. 1985 Tex.Gen.Laws, ch. 330, § 1, at 1393 [Tex.Code Cr.P. art. 12.-01]; *Fannin v. State*, 163 Tex.Cr.R. 569, 294 S.W.2d 848, 849 (1956); *Mulvehill v. State*, 395 S.W.2d 647, 649 (Tex.Cr.App. 1965). We should add, of course, that the hearsay testimony respecting what the child told various witnesses was not deprived of probative force merely because it was hearsay.

Similarly, we believe the videotape could not have been harmful in the sense that it permitted the jury to hear a repetition of the same story told by the child to the various witnesses, thereby making the story more believable in the jurors' opinion. The tape did of course allow for one more repetition of the child's story in addition to the several times various witnesses related the story. The evidence also contained the testimony of the examining physician, who observed that the child had repeated the same story to her several times with remarkable consistency. Given these various renditions of the same hearsay, without objection, we cannot conclude that the videotape increased the child's credibility in the eyes of the jury, merely in the re-telling of the child's story. The story was the same each time and both the evidence and the argument of counsel pointedly suggested that the real issue for the jury was whether the child was telling the truth on *any* occasion when she described the alleged assault.

In addition to the hearsay descriptions of the alleged assault, the jury had before it the testimony of *disinterested* witnesses who refuted certain exculpatory statements given by Offor and the mother in their testimony—particularly their statements that the child was not at home on the date of the alleged assault. Furthermore, the jury had before it the disinterested physician's testimony about the *physi-*

*cal fact* of the "gaping" vagina and her opinion that this condition was consistent with the child's story of repeated acts of sexual intercourse perpetrated by Offor. The jury also heard the physician's testimony that the details of the child's description were such that the child would likely not know them unless she had experienced what she related to the physician. Thus, a key physical fact and the observations of disinterested witnesses were consistent with the child's story. In contrast, the testimony given by Offor and the mother did not account for the physical fact and was contradicted in several important respects by disinterested witnesses. We cannot conceive that the single repetition of the child's story, in the videotape, gave it any additional credibility in the minds of the jury under these circumstances, especially when the videotape was not in any sense inflammatory.

We do not believe the videotape was harmful, in the requisite sense, on the issue of punishment. The evidence would support an inference of Offor's repeated assaults on the child—in a sufficient number to cause the abnormal "gaping" vagina— quite apart from the two specific offenses shown in the evidence. If the jury concluded the inference was true, it was also free to conclude from other evidence that the testimony adduced in Offor's defense was not only designedly false but given in an attempt to conceal all the previous assaults. The whole implied a particularly malignant viciousness toward *any* child in *any* circumstances and it would appear absolutely immaterial to the issue of punishment that a *particular* child was shown life-like on a videotape describing one assault.

■ We should finally inquire whether the videotape was harmful in light of the values protected by the constitutional right denied by its introduction into evidence. The values protected by the constitutional right of "confrontation" are two: (1) the accused's opportunity to cross-examine the witnesses against him, and (2) his opportu-

nity to have such witnesses observed by the jury who might then assess their credibility. The introduction of the videotape affects both interests adversely. *Long v. State,* 742 S.W.2d at 306.

■ As the word "opportunity" indicates, however, the hearsay contained in the videotape may be admissible in some circumstances even in the face of the accused's right to confrontation and over his objection. *Id.* at 310–312. That is to say, the two values in question *are not absolute* in the sense that they must always prevail in all circumstances. This much is implicit in the harmless-error inquiry that *Clark* directs. One familiar application of the foregoing principles is found in the rule that the admission of hearsay testimony "is properly deemed harmless and does not constitute reversible error" if the fact proved by the hearsay "is sufficiently proven *by other competent and unobjected to* evidence ..." *Livingston v. State,* 739 S.W.2d 311, 333 (Tex.Cr.App.1987) (emphasis added). Such is the case before us where Offor objected to the videotape but not to the hearsay placed in evidence by other witnesses who related the child's story exactly as she herself related it in the videotape. The hearsay related by the other witnesses was, of course, competent evidence (for the reasons stated in footnote one) and Offor did not object to it.

Accordingly, we hold the admission of the videotape, over Offor's objection, was harmless error.

## II.

■ Offor contends the trial court erred when, over his objection, the court "permit[ted] the use of an extraneous offense and specific bad acts," referring to the State's "use of the prior accusation which was reduced to the misdemeanor of injury to a child." Tex.R.Cr.Evid.Ann. 404(b) (Pamp.1988). The "bad acts" expression is apparently directed at the State's references to ongoing abuse, made in the State's opening statement.

Offor pleaded not guilty to the alleged offense. In cases such as this, Rule 404(b) does not exclude other episodes, especially when the jury is required to evaluate the inherently questionable story of a child who contends an adult perpetrated a sexual offense upon her. *Boutwell v. State*, 719 S.W.2d 164, 178 (Tex.Cr.App.1986) (opinion on rehearing); *see also* McColl & McCormack, Extraneous Offenses & Uncharged Conduct, 6–97 to 6–102 (1986). We overrule the point of error.

### III.

■ Offor complains the trial court erred when it overruled his motion to quash the indictment or to compel the State to elect between "two offenses" alleged in the indictment.

The indictment contains two paragraphs that are identical except for the manner of penetration alleged. The first paragraph alleges penetration of the child's female sexual organ. The second alleges penetration of her anus. In support of his contention that the State was bound to elect one or the other of these "two offenses," Offor cites Tex.Pen.Code Ann. § 3.04 (1974) and *Drake v. State*, 686 S.W. 2d 935 (Tex.Cr.App.1985). Neither is applicable to the case. Section 3.04 pertains to the right to a severance when two or more offenses have been consolidated for trial; Drake holds that under Tex.Code Cr.P.Ann. art. 21.24(a) (Pamp.1988) two or more *offenses* may not be alleged in a single indictment except as authorized in Chapter 3 of the Texas Penal Code.

The two paragraphs in the present indictment do *not* set forth different offenses, but only one offense that may have been committed in different ways under § 22.011(a)(2)(A) of the Texas Penal Code. It has long been held that the State may aver in separate paragraphs each of the various ways in which it contends the single offense charged may have been committed. *Martinez v. State*, 498 S.W.2d 938, 943 (Tex.Cr.App.1973); *Steambarge v. State*, 440 S.W.2d 68 (Tex.Cr.App.1969).

This manner of pleading finds express authorization in art. 21.24(b) of the Texas Code of Criminal Procedure and no election is required in such cases. *Floyd v. State*, 164 Tex.Cr.R. 50, 296 S.W.2d 523, 528 (1956); *McArthur v. State*, 132 Tex.Cr.R. 447, 105 S.W.2d 227, 230 (1937). We overrule the point of error.

### IV.

■ Offor complains he was denied discovery of information contained "in the State's file concerning a prior adjudicated offense to be used in the case as a prior specific bad act or extraneous offense." The complaint refers to Offor's previous conviction involving the same child.

The appellate record contains Offor's "Omnibus Criminal Pre–Trial Motion." That pleading contains the following passage under the heading "Discovery:"

Defendant requests all those applicable items allowed by Article 39.14 of the Texas Code of Criminal Procedure, all excupatory [sic] items permitted by *Brady v. Maryland,* and all items exculpatory or inculpatory permitted by due process and the right to counsel as provided in the Texas Constitution, the United States Constitution, and the statutory [sic] and caselaw of the State of Texas.

The trial court granted the motion and the State avers in its brief that it "complied with the motion for discovery by telling [Offor's] attorney what [was] in the file." Offor does not challenge the statement.

Immediately before the trial began, however, Offor's attorneys asked that they be permitted "to review that entire file ourselves, to look at it, because there may very well be—given that fact situation [the previous offense being reduced to a misdemeanor]—exculpatory evidence." They urged that they be permitted their own review of the file on the additional ground that it might furnish information upon which they could impeach witnesses. The trial court examined *in camera* the contents of the file in question and overruled Offor's oral motion.

The contents of the file, which the trial court examined, are not before us. We may not presume the trial court erred in its search for unspecified "evidence" or matters upon which anticipated witnesses might be impeached. No error is shown in consequence. Moreover, Offor's right to discovery was adequately protected by the trial court's actions. *Whitchurch v. State,* 650 S.W.2d 422, 425–26 (Tex.Cr.App.1983). We therefore overrule Offor's point of error.

## V.

■ At the close of the punishment stage, Offor's attorneys took the stand and testified as follows:

> I was—right after the jury was recessed ... I overheard a group of jurors, approximately five in number, in the hallway, the public hallway, and very loudly discussing the punishment in this case, and already deliberating outside in the hallway. I was approximately 25 feet away and could actually hear this discussion going on. And on the grounds [sic], I move for a mistrial.

> \* \* \* \* \* \*

> [A]pproximately 10 minutes ago, as I entered the courthouse annex building from the skyway, I passed a group of three jurors in this case in the hall and heard—it was two women and one man—heard a male voice say the word punishment, and I didn't catch the other words, but it sounded as if they were talking about this case. But he clearly said the word punishment as I passed him.

The trial court overruled the oral motion for mistrial but suggested that Offor's attorneys call the jurors as witnesses after the conclusion of the trial and then establish jury misconduct if it was to be established at all. The issue was evidently abandoned (until this appeal) because the record contains no affidavit in support of Offor's motion for new trial under Tex.Code Cr.P. Ann. art. 40.03(7) (1979).

Offor cites no authority for his contention that the trial court erred in refusing the oral motion for mistrial, based on his attorney's testimony, quoted above in its entirety. We have found none directly in point. It appears, by analogy to those decisions involving communications between a juror and a non-juror, that Offor was bound to establish harm as a result of the incident of which he complains; that is to say, harm is not presumed. *Stein v. State,* 514 S.W.2d 927 (Tex.Cr.App.1974). Such harm is not shown by the only evidence bearing on the point—the testimony of his attorneys. We hold in consequence that the trial court did not err in refusing to grant the mistrial and discharge the jury. We overrule the point of error.

## VI.

In Offor's sixth point of error, he contends the trial court erred in overruling his motion for new trial. Offor's brief does not refer to any specific ground among the nine listed in his motion for new trial. His brief does refer, however, to the following statement by the trial court:

> While the Court does find this to be a very worrisome case and does have some concerns, the Court also cannot find any legal cause at this time to disturb the verdict rendered by the Jury of 12 people. While the Court may not necessarily agree with their verdict, it was their verdict and they were brought in here to hear the evidence in this cause. And for those reasons, the motion will be denied in this case.

If we understand correctly Offor's brief, he contends the trial court was bound to set aside the jury's verdict in view of the court's expressed doubts about it. Offor cites no authority for his contention and we have found none. We overrule the point of error.

## VII.

In Offor's final point of error, he contends the trial court erred in not striking the jury panel because it "was not representative of the community as a result of

the method of selection." He refers in this regard to the fact that the panels are drawn only from among the registered voters of the county; for that reason, the panels can never be "representative" in that non-voters are automatically excluded from jury service. This argument has already been rejected by the courts. *Granviel v. State,* 552 S.W.2d 107, 119–21 (Tex. Cr.App.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977). We overrule the point of error.

We therefore affirm the judgment of the trial court.