IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 95-50057

---

NNAMDI GREGORY OFFOR,

                                        Petitioner-Appellant,

versus

WAYNE SCOTT, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, INSTITUTIONAL DIVISION,

                                        Respondent-Appellee.

---

Appeal from the United States District Court
for the Western District of Texas

---

December 20, 1995

Before REAVLEY, HIGGINBOTHAM, and BARKSDALE, Circuit Judges.
HIGGINBOTHAM, Circuit Judge:

For at least the third time in as many years, we pass upon a case in which a Texas court convicted a defendant of molesting a child after a trial in which the jury, over the defendant's objection, watched a videotaped interview of the victim describing the alleged acts of sexual abuse, an interview at which no representative of the defendant was present. See Shaw v. Collins, 5 F.3d 128 (5th Cir. 1993); Lowery v. Collins, 988 F.2d 1364, modified by 996 F.2d 770 (5th Cir. 1993). We follow both of our prior cases in holding that the admission of the videotape violated the Confrontation Clause and did not constitute harmless error. We

reverse the district court's judgment denying the petition for a writ of habeas corpus and remand to that court with instructions.

I

A Texas jury convicted Nnamdi Gregory Offor of aggravated sexual assault. Offor's direct appeal of the conviction resulted in a published opinion from the Court of Appeals of Texas, an opinion including an extensive summary of the trial testimony in this case. See Offor v. State, 749 S.W.2d 946, 947-50 (Tex. App. -- Austin, 1988, pet. ref'd, untimely filed). We relate here only those portions of the record not emphasized in that opinion.

Texas initially charged Offor with sexual assault of his stepdaughter in 1983. At that time, Offor pled guilty to the reduced charge of injury to a child. This case arose out of a later indictment charging that Offor had again sexually assaulted his stepdaughter in May of 1986.

At the trial, the state called the victim's elementary school teacher, an Austin Police Department officer, and a physician. Together, these witnesses testified to the following events. In May of 1986, the victim told her teacher that her "daddy," the term she used to describe Offor, had come into her bedroom and taken her panties off. After further conversation, the teacher called the school nurse. The school nurse questioned the child. In that interview, the victim pointed to her pubic area and said that Offor had touched her there and that this touching was at times painful. The nurse called a caseworker from the Texas Department of Human Services. After an initial consultation with the caseworker, the

2

victim went to the Austin Police Department, where an officer videotaped an interview of her. This tape was the first piece of evidence that the jury saw at Offor's trial.

In the videotape, the victim used anatomically correct dolls to describe how Offor had put his penis inside her rectum. She did so by placing the female doll, now disrobed, face down on her lap and by putting the male doll on top of it such that the male doll's penis was inside of or very near the female's rectum. She then moved the male doll up and down in a motion suggesting anal intercourse. Upon questioning from the officer, the victim said that white material resembling pus came from Offor's penis. Upon further questioning from the officer, the victim stated that Offor had put his mouth on her breasts. She later added that two to three years ago Offor had engaged in vaginal intercourse with her, but that he had stopped because she had told her mother. To describe these acts, the victim used words like "ding-a-ling," "tee-tee," "titties," and "booty" that she had previously identified as parts of dolls' anatomies.

The narrative of the victim's story was, as one would expect, disjointed and wandering. At one point, she told the interviewer that her sisters were asleep in the bed with her when the assault occurred; at another point, she said that the sisters were not present. The victim stated that Offor assaulted her on 28 occasions in an average month. There were references in rapid succession to a check that did not arrive, a treat on "Cinco de Mayo," and that she never told her mother what happened. At the

3

end of the interview, amid a discussion of the difference between telling the truth and lying, the victim confirmed that she had green ears and was four years older than she actually was.

Sometime after the interview with the police, a doctor examined the victim. The physician found that the victim had no appreciable hymen and a gaping vaginal aperture, characteristics that the physician thought could only have been caused by repeated penetration of some sort. In the consultation with the physician, the victim again recounted the story of Offor's entrance into her bedroom. According to the doctor, the victim's story did not change with repetition.

Offor defended on several grounds. First, he called the victim's mother (his wife) and his sister (the victim's step-aunt) to testify that the child had not been in the house on the night of the assault; rather the victim had stayed overnight at the aunt's house, where she had been living. Second, the defense sought to convince the jury that those investigating the allegations of abuse had been predisposed to find abuse. Third, the defense attempted to show that the victim was an extraordinarily troubled child who was desperate for attention and who made repeated accusations of sexual abuse against adults who disciplined her. The testimony regarding this latter point focused on two incidents. We recount these incidents in greater detail because the opinion of the Court of Appeals of Texas, upon which we rely as providing a detailed summary of the trial testimony in published form, makes no mention of them. The jury heard about both incidents from the victim's

4

mother, who testified on Offor's behalf; witness Irma Moffet, who was involved in the second incident, corroborated the mother's story.

In the first incident, the victim stayed with a Ms. Sanders for several days. Ms. Sanders became displeased with the victim because of certain behavior, the nature of which is not described in the trial testimony. Upon being returned to her mother, the victim told the mother that Ms. Sanders had been "digging into" the victim's vagina. In the second incident, the victim spent a day with a next door neighbor, a Ms. Moffet. During the day, Ms. Moffet discovered the victim astride Ms. Moffet's four-year-old son. Ms. Moffet informed the victim that such activity was not appropriate. Later, the victim told her mother that the boy had gotten on top of the victim, and that Ms. Moffet had slapped the victim and used foul language.

The defense sought to bolster these examples with testimony from other witnesses. In particular, a physician who had counseled the Offor family testified that, in his presence, the victim had made accusations of sexual abuse against adults only to admit, after further questioning, that the accusations were false. At least one such fabrication took the form of a story that Offor entered her bedroom to fondle her.

The prosecution responded to this portion of the defendant's case in part by attacking the credibility of the victim's mother and Offor's sister. Through various witnesses, including the caseworker, the prosecution sought to show that the two women lied

when they testified that the victim was not in the Offor household on the night that Offor had entered her bedroom. The prosecution further sought to show that portions of the mother's testimony contradicted earlier statements made to police. Finally, the prosecution called a child psychologist, who testified that in his interview with the victim he observed patterns of behavior consistent with a prolonged history of sexual abuse.

## II

The jury convicted Offor of aggravated sexual assault. After some further proceedings in the trial court, Offor received a sentence of 85 years imprisonment. On direct appeal, the Court of Appeals of Texas affirmed the conviction. It held that any error in allowing the jury to see the tape was harmless because "[t]he body of evidence outside the videotape was sufficient in our view to permit the trier of fact reasonably to find, beyond a reasonable doubt, that Offor penetrated the child's sexual organ with his own within five years of the indictment." 749 S.W.2d at 950.

After two unsuccessful petitions for state habeas relief, Offor brought a pro se action under 28 U.S.C. § 2254 alleging numerous constitutional errors in his state court trial. The district court referred the case to a magistrate judge, who recommended denying the writ. The magistrate agreed that the videotape's admission was harmless because "the body of evidence outside the videotape was sufficient to permit the trier of fact to find, beyond a reasonable doubt, that Petitioner penetrated the child's sexual organ with his own within five years of the

6

indictment." The district court overruled Offor's objections and adopted the magistrate judge's recommendation in its entirety.

Before this court, the state does not address whether the admission of the videotape violated the Confrontation Clause, but seeks to preserve the conviction on the grounds of harmless error. The state argues that "the district court below properly found that the admission of the videotape interview of the victim was harmless because there was sufficient evidence of guilt admitted at trial, apart from the videotape of the victim, to render the video duplicative."

## III

We hold that the admission of the videotape violated the Confrontation Clause. See Lowery v. Collins, 996 F.2d 770 (5th Cir. 1993), supplementing Lowery v. Collins, 988 F.2d 1364 (5th Cir. 1993). The state does not dispute this point, and we will not belabor it. Nor is it an answer that the defendant might have called the child in order to cross-examine. Id. at 771. We further hold that the tape's admission was not harmless error. We therefore reverse the judgment below and remand with instructions that the district court grant the writ.

In Lowery, this court acknowledged that the proper test for harmless error in the habeas setting is whether the error "`had substantial and injurious effect or influence in determining the jury's verdict.'" 996 F.2d at 772 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)); accord, Shaw v. Collins, 5 F.3d 128, 132 (5th Cir. 1993). We warned that Supreme Court precedent

7

prevented a court from labeling error harmless just because "`it thinks the petitioner would have been convicted even if the constitutional error had not taken place.'" 996 F.2d at 773 (quoting <u>Brecht v. Abrahamson</u>, 113 S. Ct. 1710, 1734 (1993) (Stevens, J., concurring)). Under <u>Kotteakos</u> and <u>Lowery</u>, the sufficiency of the non-tainted evidence, or the duplicative nature of the tainted evidence, is simply not the issue.

The video does not meet this test for harmlessness. The video was the victim speaking. It was direct evidence of Offor's guilt. It showed the narrative of a ten-year-old girl using anatomically correct dolls to describe a sexual assault. The narrative included all of the tangents and inconsistencies that one might expect when a little girl relates a story. The emotional appeal of this evidence was powerful.

In the version of <u>Lowery</u> decided before <u>Brecht v. Abrahamson</u>, 113 S. Ct. 1710 (1993), we observed that "[t]he tainted evidence had to have had a tremendous impact in the jury -- it was, after all, a videotaped interview in which a little boy described and demonstrated with anatomically correct dolls the selfsame acts of molestation that Lowery was alleged to have perpetrated on the child." 988 F.2d 1373. We concluded with the observation that the power of the tainted evidence was clear "when that evidence is compared to the only other basis for the conviction: physical evidence not tied to the defendant except by hearsay testimony." 988 F.2d at 1373. The jury may have heard more evidence of Offor's guilt in this case, but not so much more as to allow us to find

8

that the tape had no substantial and injurious influence upon the jury's verdict.

The Confrontation Clause exists in part to keep criminal proceedings fair, and the admission of the videotape casts serious doubts on the fairness of Offor's trial. The jury heard evidence from defense witnesses that the victim was a troubled child, desperate for attention, who had previously fabricated allegations of sexual abuse against adults disciplining her. The jury was entitled to find this evidence unworthy of credence. That the state's purpose in using the videotape rather than a live witness was to protect the child does not change its effect. This evidence showed that the state ran at least two risks in calling the victim to the stand. The victim might change or alter her story, or concede that she had fabricated the entire incident. Alternatively, the victim might testify to incidents of sexual abuse so great in number and under such impossible circumstances so as to undermine her credibility to the jury. The videotape allowed the state to solve these problems neatly. The state succeeded in having the jury hear its version of the victim's story without running the risk that she might later undermine that version. The Confrontation Clause does not allow such neat solutions. Rather, it assures that cross-examination permits the kind of probing and testing that makes oral testimony reliable.

The judgment of the district court denying the writ is reversed. The case is remanded to that court with instructions that it order the state of Texas to release the petitioner unless

the state has commenced a new trial within a reasonable time from the date the mandate of this court has issued.

REVERSED and REMANDED with instructions.