Steve KYGER, Petitioner–Appellant,

v.

Howard CARLTON, Warden, Respondent–Appellee.

No. 96–6651.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 4, 1998.

Decided June 5, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied July 20, 1998.

Sumter L. Camp, Assistant Public Defender (argued and briefed), Nashville, TN, for Petitioner–Appellant.

Timothy F. Behan, Assistant Attorney General (argued and briefed), Office of the Attorney General, Criminal Justice Division, Nashville, TN, for Respondent–Appellee.

Before: MERRITT, KENNEDY, and BOGGS, Circuit Judges.

BOGGS, J., delivered the opinion of the court, in which KENNEDY, J., joined. MERRITT, J. (pp. 383–384), delivered a separate concurring opinion.

## OPINION

BOGGS, Circuit Judge.

Steve Kyger appeals from the district court's denial of his petition for a writ of habeas corpus. The district court made its decision after a remand from this court, which had vacated a previous denial of habeas corpus. We now affirm the district court, though we rely on different grounds.

### I

### A

Around 5:20 p.m., on Friday, November 14, 1986, two men shot and killed Frank Robinson at the IGA grocery store he owned.

They also robbed him of about $9,000, before speeding away in a truck. The consensus description of the witnesses was that the passenger in the vehicle (the triggerman) was a white male, 5'7" or 5'8" and 165–200 pounds. He was wearing a dark ski mask, blue jeans, and a dark army fatigue jacket. The witnesses saw the robbers pull into a nearby parking lot, abandon their vehicle, and run away.

Other witnesses saw a man similar in description to the triggerman—white and bearded with dark hair, about 5'8", with a dark jacket and blue jeans—carrying something in his hand, running across a nearby street, and disrupting traffic. He was headed toward a stream behind an apartment building.

About thirty to forty minutes after the robbery occurred, police observed Kyger walking by the side of the road, not far from the crime scene. He generally fit the physical description they had of the triggerman, although the triggerman was reported to have been wearing tennis shoes and an army jacket, and Kyger was wearing boots and no jacket.

Kyger went into PDQ Pizza and a police officer, Sgt. Murdock, followed him in. Although he was not wearing a ski mask, Kyger's hair was matted as if he had been wearing one recently. Kyger inspired suspicion for other reasons. First of all, it was too cold out (around 40 degrees) for a person not to be wearing a jacket. Second, Kyger was soaking wet from the knees down, and his boots were filled with water. There was a slight drizzle outside, to be sure, but the rest of Kyger's clothes were dry.

Kyger ordered a pizza under the name Hammer, which later proved significant because it was the name of his brother-in-law and alleged accomplice. Murdock began asking Kyger questions about his recent doings and whereabouts. Kyger replied that he had worked at Hammer's automotive shop until about 4:30 p.m., and then began walking to a friend's house, which he was unable to find. When asked why he was wet, Kyger replied "[i]t's been raining." When asked why he had gone all the way through the rain to PDQ rather than stopping at one of the two pizzerias he passed along his purported route, Kyger said that he preferred PDQ's pizza.

Sgt. Murdock felt that Kyger was "a prime suspect for further interrogation." Kyger voluntarily accompanied Murdock to the robbers' abandoned truck, where another officer asked him some questions (apparently after giving *Miranda* warnings) before taking him to the police station for more formal questioning. At the outset of the formal questioning, about 7:45 p.m., an officer again read Kyger his *Miranda* rights and this exchange followed:

OFFICER:.... Steve, do you understand them rights?

KYGER: Yes, sir.

OFFICER: Alright, having them rights in mind; would you answer some of our questions, without an attorney present?

KYGER: *I'd just as soon have an attorney [']cause, you know—ya'll say there's been a shooting involved and that's a serious charge.*

OFFICER: Yes it is—but we're investigating. We're not saying you shot anybody. We're just investigating. *Now, if you've got something to hide, I can understand you not wanting to sign that. If you ain't got nothing to hide, you know, you can answer our questions.*

KYGER: I ain't got nothing to hide.

OFFICER: Okay. But you don't want to answer our questions without an attorney present now?

KYGER: You know, I'll answer a certain amount, you know—

OFFICER: Okay, you know—well you know you have the right to stop at any time. That's (inaudible)—

KYGER: Where do I sign at?

OFFICER: Just where it says "sign"—

OFFICER: Okay [Kyger then signs].

(JA 80B) (emphasis added).

The interrogation continued, and Kyger was apparently congenial and cooperative. Kyger stated that he had been working at Hammer's and drinking until 4:45 p.m., at which point he headed toward Bo Hill's house but got lost. Kyger described the route he took and admitted that he drank a pint of vodka in the hours before he left work. He claimed that he had gotten wet by going "through a yard or two—that's it." He denied being at the IGA or in a pickup truck, and he stated that he had not fired a gun that night.

The officers persuaded Kyger to give them his clothes so that they could be taken down to the crime lab—to eliminate Kyger as a suspect, they told him—and to have fingerprints and photographs taken. He also agreed to have a paraffin test (for gunshot-residue detection) performed on his clothes and hands. The interrogation then stopped for a brief period.

It resumed at 11:13 p.m. Kyger was again read his rights, which he said he understood. He then gave his version of events. He said that he had gone to the pizza parlor to "sober [himself] up a bit"; he planned to eat the pizza while walking back up the street, despite the fact that it was drizzling. Kyger explained that he ordered the pizza using Hammer's name because the latter name was simpler and less likely to cause confusion. He again denied having been at the IGA. He said that he was not wearing a jacket because he "didn't think it was that cold. It's about 35 or 40 degrees." He repeated his story about getting wet by walking through a couple of yards. Finally, he admitted having had "a couple of beers" in addition to his pint of vodka. The second round of questioning took 26 minutes.

### B

During their subsequent investigation, police found a pair of dark blue coveralls and a dark ski mask with the price tag still attached, down near the stream toward which the suspects had been seen heading. A coworker of Kyger's identified the coveralls as ones that she had lent to him. The gunshot residue test performed on Kyger's hand came up positive.

On November 17, police searched Hammer's home, where Kyger also lived, and found an army fatigue jacket in Kyger's closet. While there, they asked Kyger about the coveralls, and he denied owning them. Kyger was questioned again on November 19 regarding the coveralls. Officers also talked to Kyger about the coveralls on November 21, and he seems to have been re-read his *Miranda* rights.

On November 24, police questioned Kyger yet again, purportedly after giving *Miranda* warnings. He said that he had washed his hands and worn clean clothing when he left work on the day of the murder; that he did not have a pair of dark coveralls; and that he had not fired a gun on the day of the murder.

### C

Much of this evidence—both the physical evidence and Kyger's feeble attempts to exculpate himself—was presented at trial in 1987. The prosecutor specifically mentioned the November 14 police station tape in his closing statement, in an attempt to emphasize Kyger's inconsistencies and unconvincing explanations and make Kyger appear untruthful. Also mentioned were his denials regarding the coveralls, and his general denials made on November 24th. Kyger presented no defense.

The jury found Kyger guilty of first-degree murder, armed robbery, and felonious use of an automobile. He received sentences of life, thirty-five years (consecutive), and three years (concurrent), respectively.

Kyger appealed on multiple grounds, but the Tennessee Court of Criminal Appeals affirmed the conviction in 1989. *State v. Kyger,* 787 S.W.2d 13 (Tenn.Crim.App.1989). The Tennessee Supreme Court denied Kyger's application to appeal in 1990.

Kyger filed a *pro se* federal habeas petition in 1991, claiming that his rights were violated when his request for counsel was ignored on November 14 and, by extension of that request, on November 24 as well.

In 1992, the district court found—as the Tennessee Court of Criminal Appeals had—that there were Fifth Amendment violations, but that they were harmless. Accordingly, it dismissed the petition.

Kyger appealed to this court, which vacated the order of the district court and remanded the case for further findings of fact. *Kyger v. Carlton,* No. 92–5244, 1992 WL 393586 (6th Cir.1992). Among other things, we wanted to know:

1. Exactly what occurred at each of the various interviews of Steve Kyger on November 14, 1986, November 24, 1986, and at other times during the police investigation? How many interviews were there and when did they occur? What did Kyger say on the various occasions and how was this evidence admitted by the court and used by the prosecution at the trial? ... There is also some indication in the record that the police investigators may have interacted with Kyger at various times between November 14 and November 24, but the record is unclear as to when these conversations occurred and what, if any, statements were obtained.

2. Was there a violation of Kyger's constitutional rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), prior to the reading of his rights at the police station on November 14, 1986 or at any other time during the investigation? ...

. . . . .

4. What interaction was there between the investigating officers and Kyger between his release from custody on November 14, 1986, and his arrest on November 24, 1986? Did the investigating team take any evidence or statements during this period that was used at trial?

5. What evidentiary tests did the police perform, and was the constitutional validity of any of these tests affected by the Fifth Amendment violation or any other constitutional violations?

After making findings of fact and conclusions concerning these and similar factual and legal issues, the District Court should determine whether the trial court's error

was "harmless" under the standard set forth in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Id.* at *1–2 (partial citation omitted).

## D

On remand, Kyger received appointed counsel. After almost four years, Kyger's petition was again denied by the district court. The court found that Kyger's constitutional rights were violated by admitting his statements from November 14 (a point conceded by the state), and that his rights may have been violated by admitting his statements from November 24, but held that any error was harmless. It held no evidentiary hearing to reach this determination, in which it essentially adopted the findings of the Tennessee Court of Criminal Appeals. The district court held that the untainted evidence "was more than sufficient to find the petitioner guilty."

With regard to our specific questions on remand, the district court noted that:

(1) It was "unclear" what testimony was elicited during each of the two interviews on November 14, but Kyger's testimony was essentially as summarized above. The police questioned Kyger on five days: November 14, 17, 19, 21, and 24. Because Kyger's petition only challenged the admissibility of the statements from the 14th and the 24th, the district court declined to address the effect of the statements from the other days.

(2) Kyger was not read his *Miranda* rights at the pizzeria, but he did not need to have them read because at that point the police were still trying to determine if he was even a suspect. There was testimony that he was read his *Miranda* rights when he was taken to the truck. The district court did not discuss the potential violations on the 24th.

(4) In the ten days after the first interrogation, the police collected physical evidence from Kyger that was used at trial, most significantly the jacket in Kyger's closet and the gunshot residue

on Kyger's hand (gathered during the first interrogation).

(5) Kyger was given the gunshot residue test, photographed, and fingerprinted, all willingly and all after having knowingly waived his rights and before requesting counsel.

Kyger filed this timely appeal.

## II

On appeal, Kyger argues that: (1) the district court's factual findings were not clearly supported by the record; (2) his Fifth Amendment rights were violated by the admission of his statements from several days; and (3) the error in admitting the statements was not harmless.

The state argues only that Kyger waived his right to an attorney on November 14, and that even if he did not, the error was harmless. It does not attempt to address the factual discrepancies Kyger identifies, and it does not bother to discuss the admission of statements from any day other than November 14.

### A

Kyger begins by impugning the district court's factual findings. He notes that the district court reverses the chronology of the two statements from November 14 (7:45 and 11:15 p.m.) when it says that "[i]t was not until the second taped interview that the petitioner invoked his right to counsel." The district court also could not determine "what information was elicited from the petitioner during each interview on November 14th." It is clear from the transcript that Kyger is correct—it definitely was in the first interview that he asked for a lawyer, and it is equally clear from the record which statements he made and when. In terms of reviewing the district court, though, these errors are immaterial, because the court ruled that it was error to admit *any* of the statements taken from Kyger on the 14th.

### B

We now turn to a consideration of the violation of Kyger's Fifth Amendment and *Miranda* rights. First we will determine the extent of the error, and then we will evaluate the harmfulness of the error we do find.

██ First, November 14. When Kyger was taken to the site where the truck was found, before being taken into the police station, he claims that he was not read his *Miranda* rights. Kyger's *Miranda* rights were not at issue here, however, since he was not yet in custody and was being asked standard questions that, for our purposes, duplicated what Kyger had said in the earlier consensual encounter at PDQ Pizza. Furthermore, Kyger does not offer an account of any inadmissible evidence resulting from this alleged violation.

██ Later that night, Kyger was interrogated at the police station. After listening to the tape of the interrogation, we agree with the district court and the Tennessee Court of Criminal Appeals that Kyger's statement on November 14th—that he would "just as soon have an attorney"—was a request for counsel. The continuation of questioning after he did so was a violation of his rights, and the admission of his statements from that interrogation was unconstitutional. *See Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). We also agree with the Tennessee Court of Criminal Appeals that, if Kyger's request was equivocal, the subsequent statement by the police ("Now, if you've got something to hide, I can understand you not wanting to sign that. If you ain't got nothing to hide, you know, you can answer our questions.") was an inappropriate effort at pressuring Kyger to answer, rather than an appropriate attempt to get Kyger to clarify his response. *Kyger,* 787 S.W.2d at 22—23. This would also render this questioning constitutionally infirm. *See Miranda,* 384 U.S. at 454, 86 S.Ct. 1602 (disapproving of just such a tactic); *Davis v. United States,* 512 U.S. 452, 461–62, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (approving the use of clarifying questions).

Kyger next points to a *Miranda* problem from his interrogation at the police station on November 21, which the district court did not

examine.[1] Kyger was told to "come with us" from his place of work to the police station, and he did so willingly. Kyger's testimony that day, denying possession of the coveralls, was admitted at trial. There was sufficient testimony that Kyger was read his rights on the 21st, however, and we hold that there was no *Miranda* violation on that day. Kyger himself, in making a somewhat tenuous argument that he was read his rights *either* on the 21st *or* the 24th, favors a finding that his rights were read to him on the former date (Appellant's Brief at 19).

■ The final *Miranda* dispute concerns Kyger's last interrogation, on November 24. On that day, Kyger said that he had washed his hands and worn clean clothing when he left work on the 14th, and that he did not fire a gun that day. The prosecution used these statements at trial to show that Kyger was a liar, and (paradoxically) to validate the gunshot-residue test by proving that Kyger's hands were clean before he left work. The officer who talked to Kyger that day testified "to the best of his memory" that Kyger was read his *Miranda* rights. Contrary to usual procedure, though, Kyger did not sign a waiver form. Unfortunately for Kyger, he conceded in his habeas petition that he was read his rights on November 24, and that he waived them (JA 12). We therefore conclude likewise.

We note, parenthetically, that it is unclear whether the interrogation on November 24 was at the police station and was custodial, or was at Kyger's residence and was non-custodial. If it was the latter, then *Miranda* is not implicated. *See Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).

There is conflicting testimony in the record and the district court did not attempt to analyze this question, despite our order to look for potential *Miranda* violations at any point in the investigation. As discussed below, *infra* note 4, we would conclude that the error in this case was not harmless if the statements from the 24th were admitted in error. On the other hand, the error in this case *would* be harmless if those statements were properly admitted. In that instance, the determination of whether this questioning was custodial would be a task for the district court, possibly after an evidentiary hearing. Because we conclude that there was no *Miranda* violation on November 24 (both because of Kyger's concession and for reasons discussed below), there is no need for the district court to make such a determination.

## C

■ Kyger offers another argument about the statements on the 24th. He contends that his request for counsel on the 14th extends to the 24th (and to all of the custodial contacts with police in between), making questioning of him improper even if he re-waived his *Miranda* rights on the 24th. Kyger's argument rests on *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), which held that once a suspect requests an attorney, police cannot initiate further interrogation until the suspect has consulted with counsel.

We hold that *Edwards* does not, however, apply to suspects who, like Kyger, are not in continuous custody. Although this is an issue of first impression in this circuit, we note that other courts have unanimously reached this conclusion. *See, e.g., United States v.*

---

1. Kyger claims that the district court failed to respect our mandate by failing to consider matters that we requested be investigated further. We had expressed concern about all of the interactions between Kyger and the police, between November 14 and 24, and we wanted the district court to sort out what Kyger said, what of that was admitted, and, if any admissions were erroneous, whether that error was harmless. The district court stated that these issues were not in Kyger's petition (which was never amended) and hence were not properly before the court. The district court also failed to determine if Kyger's

*Miranda* rights were violated on the 24th (holding that any error would have been harmless), even though we specifically asked that the entire course of the investigation be scrutinized for *Miranda* violations, and even though that question was presented in Kyger's petition.

We are troubled at the district court's failure to answer our specific mandate. As discussed below, though, we affirm the district court. As also discussed below, however, we do so on grounds other than those used by the district court, and had we not done so we would remand this case for a second time. *See infra* note 4.

*Barlow,* 41 F.3d 935, 946 (5th Cir.1994), *cert. denied,* 514 U.S. 1030, 115 S.Ct. 1389, 131 L.Ed.2d 241 (1995); *Dunkins v. Thigpen,* 854 F.2d 394, 397 (11th Cir.1988), *cert. denied,* 489 U.S. 1059, 109 S.Ct. 1329, 103 L.Ed.2d 597 (1989); *McFadden v. Garraghty,* 820 F.2d 654, 661 (4th Cir.1987); *United States ex rel. Espinoza v. Fairman,* 813 F.2d 117, 124 (7th Cir.1987); *United States v. Geittmann,* 733 F.2d 1419, 1425 (10th Cir.1984); *United States v. Skinner,* 667 F.2d 1306 (9th Cir.1982), *cert. denied,* 463 U.S. 1229, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983).

The Supreme Court made specific reference to the significance of extended custody in *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) (holding that once a suspect has asked for counsel, *Edwards* dictates that police cannot interrogate him without counsel present, even if the suspect has had a chance to consult with counsel in the interim):

> A single consultation with an attorney does not remove the suspect from persistent attempts by officials to persuade him to waive his rights, or from the coercive pressures that accompany custody and that may increase as custody is prolonged. The case before us well illustrates the pressures, and abuses, that may be concomitants of custody.

*Id.* at 153, 111 S.Ct. 486 (emphasis added). Minnick was in continuous custody, and resisted efforts to make him answer questions. *Id.* at 154. Kyger, by contrast, was not in jail. He was subject to periodic questioning—some custodial and some not custodial, but never under improper pressure—every two or three days. He had ample time during that period to consult with an attorney if he so desired. The concern of *Edwards*—coercive questioning by the government that deprives a suspect of the benefits of the counsel he has requested—simply is not implicated when a suspect is not in continuous custody.

■ Therefore, Kyger suffered no *Miranda* violation on November 24. The only violation occurred on the 14th, and it is only that violation that we now analyze for harmfulness.[2]

D

■ Turning now to our harmless-error analysis, we note first that the district court used the incorrect legal standard. In our remand, this court directed the district court to use the standard from *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), which requires that the error be harmless beyond a reasonable doubt. Subsequent to the remand, however, the Supreme Court decided *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *Brecht* held that, on collateral review, an error is harmful if it has a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 623, 113 S.Ct. 1710 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). The district court nevertheless applied the old *Chapman* standard.

■ The district court examined the evidence and found that, subtracting the problematic evidence, there was still more than enough evidence to convict Kyger.[3] The

**2.** We note that even though there was a *Miranda* violation on November 14, the physical evidence taken from Kyger that day is still admissible. Fingerprinting and gunshot-residue testing are within the scope of the *Schmerber* exception (allowing non-consensual drawing of blood for evidentiary purposes), and do not require the consent of the suspect. As such, it did not matter whether Kyger had a lawyer present—the gunshot test results are admissible. *See United States v. Bridges,* 499 F.2d 179, 184 (7th Cir.) ("[S]wabbing, like drawing the defendant's blood in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), was not a violation of [the Fifth] Amendment's protection against self-incrimination, since the swabbing did not 'provide the state with evidence of a testimonial

or communicative nature....' *Id.* at 761, 86 S.Ct. 1826.") (citation omitted), *cert. denied,* 419 U.S. 1010, 95 S.Ct. 330, 42 L.Ed.2d 284 (1974).

**3.** The state appeals court and the district court (before our remand) held that the error of admitting Kyger's November 14 statements was harmless because the statements were exculpatory. The state continues to make this argument. Their argument is that the admission of these statements was not only *not* prejudicial to Kyger, it was *helpful* to him. We are unpersuaded by this argument. We know better than to think that the prosecution admitted evidence and emphasized it in its opening and closing statements purely out of such a benign motive. Kyger's

court's answer to this question was probably right, to be sure, but it was asking the wrong question. The *Brecht* test does *not* say "only errors that turn acquittals into convictions are harmful." As Justice Stevens put it in *Brecht*, "the question is *not* 'were they [the jurors] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision....'" *Brecht*, 507 U.S. at 642–43, 113 S.Ct. 1710 (Stevens, J., concurring) (alteration in original) (quoting *Kotteakos*, 328 U.S. at 764, 66 S.Ct. 1239). We will now analyze the error under the proper standard.

■ To summarize, the erroneously admitted evidence from the interrogation included the following information:

(1) Kyger stated that he had been working at Hammer's, where he drank a pint of vodka and a couple of beers. He headed toward Bo Hill's house but got lost, and went to the pizza parlor to "sober [himself] up a bit." Kyger denied being at the IGA or in a pickup truck.

(2) Kyger claimed that he had gotten wet by going "through a yard or two."

(3) Kyger said that he gave the false name "Hammer" at the pizza store because that name was less likely to cause confusion.

(4) Kyger said that he was not wearing a jacket because he "didn't think it was that cold. It's about 35 or 40 degrees."

(5) Kyger stated that he had not fired a gun that night.

We cannot conclude that any of this evidence had a substantial and injurious effect or influence in determining the jury's verdict.

The first four items are either insubstantial, non-injurious, or both. The fifth item is the only one that is problematic.

The state would have us hold that, because the evidence showed that Kyger had fired a gun that day, Kyger's denial is irrelevant or possibly even exculpatory. We disagree. While it may be unremarkable that Kyger had fired a gun recently, it added weight to the evidence against him when he *denied* that he fired it.

Nevertheless, we hold that this evidence did not have a "substantial and injurious effect or influence in determining the jury's verdict." On the 24th, Kyger also denied having fired a gun, and stated that he had washed his hands after work. We have held that that statement was admissible.[4] The mere fact that Kyger also registered this denial on the 14th is not harmful. Granted, the prosecution may have found the taped statement from the 14th important as well (though it referred only to the denial from the 24th in its closing statement), but we do not find that this additional evidence had a "substantial and injurious effect or influence."

We recognize that the mere fact that erroneously-admitted evidence was duplicative of valid evidence does not automatically render the error harmless. *See Offor v. Scott*, 72 F.3d 30, 33 (5th Cir.1995). There are, no doubt, situations in which duplicative evidence has a powerful bolstering effect. More importantly, it is improper in a *Brecht* inquiry to focus on the sufficiency of the untainted evidence.

In this case, however, the fact that the improperly-admitted evidence was duplicative is important in weighing the effect that

---

statements contradicted hard physical evidence and made him look like a liar. As the Second Circuit has noted:

A defendant's false exculpatory statement is admissible at trial to show his consciousness of guilt and may be an important part of the government's proof. If the statement was taken in violation of the defendant's constitutional rights, the fact that it was meant to exculpate does not make it any less subject to suppression. *See Miranda v. Arizona.*

*United States v. Quiroz*, 13 F.3d 505, 510 (2d Cir.1993) (citations omitted).

4. Were we to hold that the evidence from November 24 was not admissible, we would be forced to conclude that the cumulative error would be harmful. As such, if our conclusions about the admissibility of those statements were different, we would remand to the district court for a determination of whether the statements of the 24th were custodial. If they were, and the statements of the 24th were thus inadmissible, Kyger would be entitled to habeas relief.

the admission of that evidence had. The admission of a single denial by Kyger would have had a substantial and injurious effect. The admission of a second denial, however, while relevant, is not nearly as substantial or injurious. This "diminishing marginal injury" will not always result in error being rendered harmless, to be sure, but our review of the record and the case against Kyger leads us to conclude that it renders the error in this case harmless. *Cf. Cooper v. Taylor,* 103 F.3d 366, 370–71 (4th Cir.1996) (en banc) (holding erroneously-admitted confession harmless when there were two other, validly-admitted confessions; and holding that when evidence against defendant is overwhelming and one-sided, there is no room for even highly relevant evidence to have a prejudicial effect), *cert. denied,* —— U.S. ——, 118 S.Ct. 83, 139 L.Ed.2d 40 (1997).

Therefore, we find that the error in admitting evidence obtained in violation of Kyger's *Miranda* rights was harmless.

## III

For the foregoing reasons, the district court's denial of habeas corpus relief is AFFIRMED.

MERRITT, Circuit Judge, concurring.

I concur in the result reached in Judge Boggs' opinion but not in the reasoning of the opinion. I do not believe that a *Miranda* violation occurred in this case, and therefore I do not believe that we need to reach the harmless error question.

After advising Kyger of his *Miranda* rights, this is the exchange that took place:

Q. Alright having them rights in mind would you answer some of our questions without an attorney present?

A. I'd just soon have a attorney cause, you know, you all saying that there's been a shooting involved and that's a serious charge.

Q. Yes it is but we're investigating. We're not saying you shot anybody, we're just investigating. Now if you have something to hide I could understand you not wanting to sign that. If you ain't got

nothing to hide, you know, you'll answer our questions.

A. I ain't got nothing to hide.

Q. O.K. but you don't want to, you don't want to answer our questions without an attorney present now?

A. You know, I'll answer a certain amount, you know.

Q. O.K. you know you have the right to stop at any time. That's what's on there.

A. Where do I sign at?

In *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the Supreme Court said in a similar case that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require cessation of questioning." I do not regard Kyger's statement, "I'd just soon have a attorney" as a clear assertion of the right to counsel, especially in light of his answer when specifically asked whether he wanted an attorney present now. His answer was, "You know, I'll answer a certain amount, you know." It seems to me that his answers about whether he wanted an attorney present were ambiguous until the specific question was put to him and he answered, "I'll answer a certain amount."

It is entirely reasonable for an officer under these circumstances to attempt to determine in a clear fashion whether a defendant wants a lawyer present or not. After some ambiguous answers, Kyger said he would answer the questions. In light of the language in *Davis* that the invocation of the right to counsel requires a clear statement, I do not believe that the officers violated Kyger's right to counsel in this case.

On the other hand, if I construed the exchange in question as an invocation of the right to counsel, and therefore as a violation of the Constitution, I would not find harmless error. Kyger's comments during the interrogation were in my opinion highly inculpatory because they showed, in light of the real facts, that he was lying. The prosecution took full advantage of these lies at trial,

repeatedly juxtaposing what Kyger told the police with what the physical evidence actually showed. To make matters worse, the trial judge specifically instructed the jury to consider Kyger's statements "[e]xpress admissions against interest ... which tend, together with other facts, to establish his guilt." I feel sure (given the prosecution's extensive reliance on them and the judge's instruction suggesting the conclusion to be drawn from them) that the jury used Kyger's statements to infer that he was fleeing the scene of the murder when he was arrested. Surely "the guilty verdict actually rendered in *this* trial" was attributable to those statements. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). Judge Boggs' conclusion that their effect was "insubstantial," "non-injurious," or marginally "problematic," while imaginative, is unpersuasive to me.