**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
October 18, 2011

Lyle W. Cayce
Clerk

No. 10-50243

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MIGUEL ANTONIO CARRILLO,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before GARZA and DENNIS, Circuit Judges.[1]

DENNIS, Circuit Judge:

The defendant-appellant, Miguel Carrillo, was convicted by a jury of possessing with intent to distribute methamphetamine and sentenced to 172 months' imprisonment. On appeal, he contends that his confession should have been suppressed because it was obtained in violation of his constitutional right not to be interrogated while in police custody without an attorney present, under *Miranda v. Arizona*, 384 U.S. 436 (1966). He also claims that the district court erred by giving the jury an instruction regarding what inferences could be drawn

---

[1] Judge Garwood was a member of the panel that heard oral arguments but due to his death on July 14, 2011, did not participate in this decision. This case is being decided by a quorum. 28 U.S.C. § 46(d).

from his flight from the police.  He additionally argues that the prosecution's use of certain evidence regarding his prior acts violated Rule 404(b) of the Federal Rules of Evidence.  Lastly, he contends that the district court should not have required him not to consume any alcohol as a condition of his supervised release.  For the reasons assigned below, we affirm Carrillo's conviction and sentence.

## BACKGROUND

Carrillo was tried together with Lori Rodriguez, his girlfriend; each of them was charged with one count of possessing with intent to distribute five grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1).  The jury found Carrillo guilty and Rodriguez not guilty.

At trial, Detective Robby Mobley of the Midland, Texas Police Department testified that he learned from Rodriguez's sister that Carrillo and Rodriguez were traveling by car to California together on September 6-7, 2009, to acquire methamphetamine and bring it back to Midland.  Mobley contacted Border Patrol agents at the Sierra Blanca checkpoint on September 7 and gave them a description of Rodriguez's car, a blue Honda Accord.

A Border Patrol agent testified that on September 7, a car matching Mobley's description arrived at the checkpoint, with Rodriguez driving and Carrillo as the sole passenger.  A drug-sniffing dog alerted to the car, and Border Patrol agents then searched the car and Rodriguez and Carrillo's persons, but they found no illegal drugs.  After about an hour and a half, Rodriguez and Carrillo were allowed to leave the checkpoint.

Detective Sean Sharp of the Midland Police Department testified that on September 7, he assisted Detective Mobley in looking for Rodriguez and Carrillo after they had left the checkpoint.  He was stationed on an interstate highway west of Odessa, Texas.  He was not in uniform and was driving an unmarked sport-utility vehicle.  When he saw a blue Honda Accord, he followed it.  He could not identify the occupants of the Accord, but he was able to see "a male

driver and a female passenger." After a couple of miles, the Accord took an exit and stopped at a red light. The car then ran the light. Sharp continued to follow, and "[t]he car just slowly continued to increase speed." Sharp was "sure they figured [he] was following them." At one point, the car pulled into a gas station parking lot, then pulled back out onto the road without stopping. The car then stopped at another red light. According to Sharp, "at that light there was traffic in front of us, so I stopped and got out and displayed my badge and approached the vehicle. Before I could get up to it, the driver took off through the -- through the light and through the intersection northbound." He explained, "there were still vehicles in front of the Honda Accord as it drove around them to go through the intersection." Sharp continued to follow, and "[t]he driver was driving into oncoming traffic, basically just dodging cars as they were approaching. I'm guessing upwards of 60 miles per hour." Sharp stopped the pursuit because, he said, "I was afraid that they were going to keep running from me and ending up getting in a wreck."

Rodriguez subsequently testified that Carrillo was driving the car at that time. According to Rodriguez, Carrillo said, "somebody is following us." She said she believed the reason they were being followed was because Carrillo "was messing around with somebody and they wanted to kick his butt, messing with their wives, girlfriend." She said she did not think the person following them was a police officer. Carrillo did not testify.

At the time of these events, Carrillo was on parole, as a result of a previous conviction under state law. Detective Mobley testified that he contacted Carrillo's parole officer and a warrant was issued for Carrillo's arrest for a parole violation. On September 9, 2009, Carrillo was arrested.

Mobley further testified that on September 9, with Rodriguez's permission, he and other police officers searched the residence where Rodriguez and Carrillo lived. They found, inter alia, a "crystal substance" that tested positive for

No. 10-50243

methamphetamine in a field test; "what appeared to be meth manufacturing recipes"; a digital scale; and several unused small plastic bags.

While Carrillo was in jail, on September 10, 2009, he had a lengthy interview with Detectives Mobley and Sharp, which Mobley recorded with a tape recorder. In that interview, Carrillo admitted, inter alia, that when he and Rodriguez went through the Border Patrol checkpoint, he had three ounces of methamphetamine taped to his body which the agents failed to discover. He also admitted that he was supposed to deliver part of those three ounces to another man in Midland.

Before trial, Carrillo moved to suppress the recording. At the suppression hearing, Mobley testified about the circumstances surrounding the interview. Mobley first went to talk to Carrillo in jail on September 9, the day of his arrest. However, Carrillo invoked his constitutional right not to be interrogated without an attorney present, and Mobley then stopped talking to him and left. The next day, September 10, Mobley received a phone message from an officer at the jail, who said that Carrillo wanted to talk to him. Mobley returned to the jail, along with Sharp, and the two detectives talked with Carrillo. In that interview, there was some discussion about Carrillo's right to an attorney. Specifically, Mobley read Carrillo his rights, and then the conversation went as follows:

Carrillo:   I just man, I'm not gonna lie to you I wish I had a lawyer right here knowing that you know it's gonna I mean I'm gonna work with y'all I'm telling you I'm gonna tell you everything

Mobley:   Yah but I

Carrillo:   But you know I'm just see I don't want to get fucked on this shit is all I'm saying I mean I gotta work out for me too

Mobley:   I know I understand that

Carrillo:   I can tell you

4

No. 10-50243

Mobley:      But you call me out there and you didn't want over this the other day

Carrillo:    I told that man that I want him to come up here and I wanted to talk with you

Mobley:      OK

Carrillo:    And I wanted to see if we could push this to where I could get my lawyer cause I was supposed to go upstairs to go uh to see the judge and then I get up there and they're telling me that I'm not even supposed to be there[2]

Mobley:      (Gets on the phone)

Mobley:      Here is the deal if you want to talk to us

Carrillo:    I do but I just don't want to fucked on this is all I'm telling you is all I'm asking

Mobley:      Well.

Carrillo:    You know I I mean

Mobley:      I under, I understand but

Carrillo:    No cause I could tell

Mobley:      But we went through the same deal the other day I mean why would you call me back up here if you're saying

Carrillo:    Cause I told that man that I wanted to see if you could work with me and push this deal to where I can get a lawyer and just sit down and talk about it

Mobley:      Well I can't do that until you're arraigned

Carrillo:    So what happens if I talk to you right now I'm fixing to go to Odessa or what?

---

[2] It is unclear what happened in the incident to which Carrillo referred here. The parties' briefs do not explain it, and Carrillo does not argue that it involved a violation of his rights.

5

No. 10-50243

Mobley:    No

Carrillo:    So what does that mean I mean

Mobley:    If you talk to me right now you're just you're just you're just cooperating and and and you know helping yourself and nothing's gonna change until you get into the federal system and then you'll get an attorney

Carrillo:    So you know for sure I'm gonna get in the federal system?

Mobley:    Yah.

Carrillo:    Alright.

Mobley:    That's, she's[3] already in federal custody

Carrillo:    Buts that's.  Ya

Mobley:    But there'll be a retainer filed on you or a remand filed on you to where whenever you take care of your state stuff you'll automatically go on to the same charge she's facing

Carrillo:    Same charge as she's facing?

Mobley:    Right now you've just been charged with the stuff that was found at the house but like I said there's a bigger thing coming involving a big conspiracy uh it it'll be a lot better to be a witness on that than be another defendant in another case so

Sharp:    Separate charges

Mobley:    Ya

Sharp:    You got the possession within intent, which has to do with the house right?  And then conspiracy will be a whole other charge and the amount will be aggregated the total amount of the dope means the weight will go up does that make sense?

Carrillo:    Ya

---

[3] The person referred to as "she" in this portion of the interview was Rodriguez.

Mobley:      And you know who it involves

Carrillo:     Ya.  So what do you need to know?

The remainder of the conversation consisted of Carrillo giving the detectives information about various people who were involved in distributing methamphetamine, as well as admitting to his own possession and distribution of methamphetamine.

At the suppression hearing, Mobley testified that he did not understand Carrillo to have been requesting an attorney or invoking his right not to be questioned without an attorney present.  The district court issued a written order denying Carrillo's motion to suppress, on the grounds that Carrillo did not make an unambiguous request for an attorney and that he knowingly and intelligently waived his right not to be questioned without an attorney present.  Accordingly, at trial, the recording of the September 10 interview was played for the jury to hear.

Also at trial, Rodriguez's nephew, P.J. Lara, testified that he had smoked methamphetamine with Carrillo and Rodriguez on some occasions in July and August 2009.  The defense objected to this testimony under Rule 404(b) of the Federal Rules of Evidence.  The district court overruled the objection, but gave a limiting instruction, telling the jury they could not consider the testimony in deciding whether the defendants had committed the acts they were charged with, but that they could consider it in relation to the defendants' mental state, such as their knowledge or intent.

The prosecution also introduced, through Mobley's testimony, the fact that Carrillo had been convicted in 2005, in a Texas court, of "the offense of delivery of a controlled substance, cocaine, 4 grams or more but less than 200 grams."  The defense objected to this evidence under Rule 404(b).  The district court overruled the objection, but gave a limiting instruction, telling the jury that they could not consider the prior conviction in deciding whether Carrillo had

committed the act he was charged with, but that they could consider it in relation to his mental state.

After the close of all the evidence, the district court gave instructions to the jury, including an instruction regarding what inferences could be drawn from the testimony they had heard regarding Carrillo's flight from Detective Sharp. (The instruction is quoted in full below in footnote 4.) Carrillo's counsel made a general objection to that instruction. ("We object to the flight instruction on pages 12 and 13.") The district court overruled the objection.

The jury found Carrillo guilty and Rodriguez not guilty. Carrillo was sentenced to 172 months of imprisonment, to be followed by eight years of supervised release. As one of the conditions of supervised release, the district court required Carrillo not to consume any alcohol. Carrillo did not raise any objection to this condition.

## ANALYSIS

Carrillo raises the following arguments on appeal: (1) that the police violated his constitutional right not to be interrogated without an attorney present, and therefore the district court should have granted his motion to suppress his confession; (2) that if he waived the aforementioned right, the waiver was invalid because the police deceived him, and thus the motion to suppress should have been granted; (3) that the district court should not have given a jury instruction regarding his flight; (4) that Lara's testimony about smoking methamphetamine with Carrillo and Rodriguez in July and August 2009 was inadmissible under Rule 404(b) of the Federal Rules of Evidence; (5) that evidence of Carrillo's prior conviction for delivery of cocaine was inadmissible under Rule 404(b); and (6) that the district court abused its discretion by completely prohibiting him from consuming alcohol as a condition of his supervised release.

No. 10-50243

## I.

Carrillo first argues that the district court should have granted his motion to suppress his confession, because during the interview on September 10, he told Detectives Mobley and Sharp that he wanted to exercise his constitutional right to have counsel present. Carrillo's argument relies on three comments he made during that interview: "I wish I had a lawyer right here"; "I wanted to see if we could push this to where I could get my lawyer"; and "I wanted to see if you could work with me and push this deal to where I can get a lawyer and just sit down and talk about it." These comments, when viewed in isolation, do appear to constitute a clear invocation of Carrillo's right to have counsel present. However, considering the entire context in which Carrillo made the comments, a reasonable police officer would not have understood him to be saying that he wanted to stop talking with the police without an attorney present. We therefore conclude that the district court did not err by denying Carrillo's motion to suppress.

"In reviewing a district court's denial of a defendant's motion to suppress, this court reviews factual findings, including credibility determinations, for clear error, while we review legal conclusions de novo." *United States v. Montes*, 602 F.3d 381, 385 (5th Cir.), *cert. denied*, 131 S. Ct. 17 (2010). "[A] district court's determination regarding the validity of a defendant's waiver of his *Miranda* rights is a question of law reviewed de novo." *United States v. Cardenas*, 410 F.3d 287, 292 (5th Cir. 2005) (quoting *United States v. Solis*, 299 F.3d 420, 439 (5th Cir. 2002)). In this case, there are no disputed facts relevant to the motion to suppress. Therefore, we apply a de novo standard of review to the district court's legal conclusion that Carrillo validly waived his right not to be questioned without an attorney present.

"[A]n accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation." *Edwards v. Arizona*, 451 U.S.

No. 10-50243

477, 482 (1981) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)). "[A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-85. However, when a suspect invokes his right to counsel, the police do not have to immediately provide counsel; they only have to stop questioning the suspect without counsel. In *Duckworth v. Eagan*, 492 U.S. 195 (1989), the Supreme Court explained, "*Miranda* does not require that attorneys be producible on call, but only that the suspect be informed . . . that he has the right to an attorney before and during questioning . . . . If the police cannot provide appointed counsel, *Miranda* requires only that the police not question a suspect unless he waives his right to counsel." *Id.* at 204. For this reason, the *Duckworth* Court held that police did not mislead a suspect about his *Miranda* rights by informing him in writing that "[w]e have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court." *Id.* at 198.

Further, a suspect's ambiguous reference to counsel is not enough to trigger the requirement that police must immediately stop questioning the suspect. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [the Supreme Court's] precedents do not require the cessation of questioning." *Davis v. United States*, 512 U.S. 452, 459 (1994). Rather, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect." *Id.*

No. 10-50243

Carrillo argues that when he said "I wish I had a lawyer right here," his words were similar to language used by the Supreme Court in *Miranda* itself — "if an individual indicates that he *wishes* the assistance of counsel before any interrogation occurs, the authorities cannot rationally ignore or deny his request on the basis that the individual does not have or cannot afford a retained attorney," 384 U.S. at 472 (emphasis added) — and that his words should therefore have been enough to invoke his right not to be questioned without an attorney present. He also argues that his words resembled those found in *Alvarez v. Gomez*, 185 F.3d 995 (9th Cir. 1999), which held that the police should have ceased interrogating a suspect after he "asked three questions: (1) 'Can I get an attorney right now, man?' (2) 'You can have attorney right now?' and (3) 'Well, like right now you got one?'" *Id.* at 998. Likewise, he relies on *Kyger v. Carlton*, 146 F.3d 374 (6th Cir. 1998), which held that the police should have stopped questioning a suspect when he said he would "just as soon have an attorney." *Id.* at 379.

Notwithstanding the apparent similarities between what Carrillo said and the language found in *Miranda*, *Alvarez*, and *Kyger*, the particular facts of the present case lead us to conclude that Carrillo was not attempting to invoke his right not to be questioned by the police without an attorney present. Carrillo was arrested on September 9, 2009, and Detective Mobley spoke to him in jail that day. It is undisputed that during that conversation on September 9, Carrillo invoked his right not to be questioned without an attorney present, and Mobley ended the interview. The next day, September 10, Carrillo initiated further communication, and Detectives Mobley and Sharp came back to the jail to question him. Thus, on September 10, Carrillo clearly knew that he could bring the interview to an end by saying he did not want to talk to the detectives further without an attorney present, since that was exactly what had happened the day before.

No. 10-50243

After Mobley read him his rights, Carrillo said, "I just man, I'm not gonna lie to you I wish I had a lawyer right here knowing that you know it's gonna I mean I'm gonna work with y'all I'm telling you I'm gonna tell you everything." Under the circumstances, this comment was ambiguous at best. It certainly expressed Carrillo's *preference* to have an attorney present; however, the fact that Carrillo kept talking and said "I'm going to tell you everything" tended to indicate that he also desired to keep the interview going and not to end it by invoking his right not to be questioned without an attorney present. Moreover, Carrillo re-initiated communication with Mobley after the previous day's interview had ended with Carrillo's invocation of his right to have an attorney present during questioning. Thus, the circumstances tended to show that Carrillo wanted to continue talking to the detectives, or at least that he was still making up his mind about whether to keep talking, and that he knew he could end the interview at any time if he chose to do so.

Carrillo and the detectives then continued to discuss Carrillo's right to counsel. Carrillo said, "I wanted to see if we could push this to where I could get my lawyer," and then reiterated that "I wanted to see if you could work with me and push this deal to where I can get a lawyer." In response to these comments, Mobley explained, "I can't do that until you're arraigned." Carrillo then asked, "So what happens if I talk to you right now?" Mobley answered: "If you talk to me right now you're just you're just you're just cooperating and and and you know helping yourself and nothing's gonna change until you get into the federal system and then you'll get an attorney." These explanations by Mobley resemble the statement in *Duckworth* that "[w]e have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court." 492 U.S. at 198. Carrillo's comments and questions indicate to us that he was still deciding what he should do, not that he was invoking his right not to be questioned without an attorney present. Only when Carrillo, apparently having

12

No. 10-50243

made up his mind, said "So what do you need to know?" did the detectives begin interrogating him about his criminal activities.

Under *Davis*, a police officer must cease questioning a suspect if the suspect "articulate[s] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." 512 U.S. at 459. If "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," the officer does not have to stop questioning the suspect. *Id.* In the circumstances presented by this case, we do not believe that a reasonable police officer in Mobley and Sharp's position would have understood Carrillo to be invoking his "Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation" under *Edwards*, 451 U.S. at 482. Rather, the transcript of the interview indicates to us that Carrillo — who had voluntarily reached out to the detectives and was clearly aware that he could bring the interview to an end by exercising his right to have counsel present — was weighing the pros and cons of talking to the detectives without the presence of an attorney, and that he eventually decided to do so. Only after Carrillo had evidently decided to cooperate did the detectives begin questioning him about his criminal activities. Accordingly, we conclude that in the September 10 interview, Carrillo did not clearly invoke his right not to be questioned without an attorney present, and therefore the district court did not err by denying his motion to suppress his confession.

## II.

Carrillo argues in the alternative that the detectives unlawfully deceived him into waiving his right to have counsel present during questioning. A waiver of *Miranda* rights "'must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and

13

the consequences of the decision to abandon it.'" *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). However, we are not persuaded that Carrillo's waiver of his right was the product of deception, because Carrillo has not identified any statement by the detectives that was actually false or deceptive.

Mobley told Carrillo that he would not get an attorney until he was arraigned in federal court, and that he would not be arraigned in federal court until after his state parole revocation hearing. Mobley's exact words were, "I can't do that until you're arraigned . . . nothing's gonna change until you get into the federal system and then you'll get an attorney." Carrillo asked, "So you know for sure I'm gonna get in the federal system?" Mobley answered affirmatively ("Yah"), and explained, "There'll be a retainer filed on you or a remand filed on you to where whenever you take care of your state stuff you'll automatically go on to the same charge she's facing" — meaning the same charge that Rodriguez was facing in federal court, namely, possession with intent to distribute methamphetamine.

Carrillo concedes that he was not entitled to have an attorney appointed for him prior to his arraignment. Nonetheless, he suggests that Mobley's comments were deceptive because he was "entitled to an attorney for his state charges as well." Appellant's Reply Br. 7-8. But the record indicates that Carrillo was not actually charged with any new crimes under state law; he was only charged with a parole violation. Under *Gagnon v. Scarpelli*, 411 U.S. 778 (1973), parolees are not automatically entitled to appointed counsel at revocation hearings. "In *Gagnon* . . . , the Supreme Court held that a parolee is not absolutely entitled to appointed counsel at a revocation hearing, and 'that the decision as to the need for counsel must be made on a case-by-case basis in the exercise of a sound discretion by the state authority charged with responsibility for administering the probation and parole system.'" *Ex parte Taylor*, 957

No. 10-50243

S.W.2d 43, 47 (Tex. Crim. App. 1997) (quoting *Gagnon*, 411 U.S. at 790). "Although the presence and participation of counsel will probably be both undesirable and constitutionally unnecessary in most revocation hearings, there will remain certain cases in which fundamental fairness — the touchstone of due process — will require that the State provide at its expense counsel for indigent probationers or parolees." *Meza v. Livingston*, 607 F.3d 392, 404 n.13 (5th Cir. 2010) (quoting *Gagnon*, 411 U.S. at 790).

Carrillo has not indicated that he was facing any state charges for which he was entitled to the appointment of counsel. Nor has he attempted to show that his state parole revocation hearing involved any circumstances that required an attorney to be appointed for him, under either Texas law or federal law. Therefore, when Mobley told Carrillo that an attorney would not be appointed for him until he was arraigned in federal court, he was providing accurate information, not engaging in deception. We conclude that the police did not deceive Carrillo into waiving his constitutional right not to be questioned without an attorney present.

## III.

Next, Carrillo argues that the district court should not have instructed the jury that they could consider evidence of flight in determining his guilt or innocence.[4] "District courts enjoy substantial latitude in formulating a jury

---

[4] The flight instruction, in full, was as follows:

> You have heard testimony in this trial that the defendant Miguel Antonio Carrillo fled from law enforcement officers. Intentional flight immediately after a crime has been committed, and/or while a crime is ongoing, is not, of course, sufficient in itself to establish his guilt but is a fact which, if proved, may be considered by you, in light of all the evidence in this case, in determining guilt or innocence. Whether the defendant's conduct in this case constituted flight is exclusively for you to determine. If you do so determine, whether or not that flight showed a consciousness of guilt on the defendant's part and the significance to be attached to that evidence are also matters exclusively within your province.
> In your consideration of any evidence of flight, if you should find that

15

No. 10-50243

charge, and hence we review all challenges to, and refusals to give, jury instructions for abuse of discretion." *United States v. Webster*, 162 F.3d 308, 321-22 (5th Cir. 1998). "We consider whether the instruction, taken as a whole, 'is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them.'" *United States v. Freeman*, 434 F.3d 369, 377 (5th Cir. 2005) (quoting *United States v. Daniels*, 281 F.3d 168, 183 (5th Cir. 2002)).

"A flight instruction is proper when the evidence supports four inferences: 1) the defendant's conduct constituted flight; 2) the defendant's flight was the result of consciousness of guilt; 3) the defendant's guilt related to the crime with which he was charged; and, 4) the defendant felt guilty about the crime charged because he, in fact, committed the crime." *United States v. Martinez*, 190 F.3d 673, 678 (5th Cir. 1999) (citing *United States v. Murphy*, 996 F.2d 94, 97 (5th Cir. 1993)). In this case, Detective Sharp testified that he approached the car Carrillo was driving and displayed his police badge, and that Carrillo then "took off," ran a red light, and drove dangerously into oncoming traffic before Sharp abandoned the pursuit. Moreover, the evidence, including Carrillo's confession, indicated that when this sequence of events occurred, Carrillo possessed and intended to distribute methamphetamine — the crime with which he was charged. From these facts, the jury could have rationally drawn each of the four

---

there was any, you should also consider that there may be reasons for this that are fully consistent with innocence. There may be many reasons for a person to be reluctant to be interviewed by police officers that are perfectly innocent reasons and that in no way show consciousness of guilt on the part of that person. Also, a feeling of guilt does not necessarily reflect actual guilt of the alleged crimes under your consideration. You should always bear in mind that the law never imposes on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

This instruction was similar to one that we quoted approvingly in *United States v. Williams*, 775 F.2d 1295, 1299-1300 (5th Cir. 1985). Carrillo does not argue that there was any problem with the instruction's specific wording.

16

No. 10-50243

inferences that are prerequisites for a flight instruction under *Martinez* and *Murphy*. Therefore, the district court did not abuse its discretion by giving the flight instruction.

**IV.**

Carrillo contends that the district court erred by allowing P.J. Lara (Rodriguez's nephew) to testify about having smoked methamphetamine with Carrillo and Rodriguez in July and August 2009. He argues that the government failed to comply with Rule 404(b) of the Federal Rules of Evidence. Under Rule 404(b), "evidence of other crimes, wrongs, or acts" may be admissible for certain purposes, but the rule requires "that on request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." Carrillo argues that the government did not provide any such notice and that the testimony was therefore inadmissible. *See* Fed. R. Evid. 404(b) advisory committee note (1991 Amendments) ("Because the notice requirement serves as condition precedent to admissibility of 404(b) evidence, the offered evidence is inadmissible if the court decides that the notice requirement has not been met.").

"We review the admission of evidence under Federal Rule of Evidence 404(b) under a 'heightened' abuse of discretion standard." *United States v. Templeton*, 624 F.3d 215, 221 (5th Cir. 2010) (quoting *United States v. McCall*, 553 F.3d 821, 827 (5th Cir. 2008)), *cert. denied*, 131 S. Ct. 1530 (2011). "Evidence in criminal trials must be strictly relevant to the particular offense charged." *Id.* (quoting *United States v. Jackson*, 339 F.3d 349, 354 (5th Cir. 2003)) (internal quotation marks omitted). "However, we do not reverse for erroneous admissions under Rule 404(b) if the error was harmless." *Id.* "An error is harmless when it does not affect the substantial rights of a party. The

17

government has the burden of establishing harmlessness beyond a reasonable doubt." *United States v. McCall*, 553 F.3d 821, 827 (5th Cir. 2008).

The government first argues that it complied with Rule 404(b)'s notice requirement. It cites a document in the record called "Second Notice to Defendants of Government's Intention to Introduce Other Acts of Defendants at Trial." However, that document only gives notice of the government's intent to introduce evidence of Carrillo's "repeated distribution of methamphetamine . . . over a period of 12 to 18 months up until the time of [Carrillo's and Rodriguez's] arrest." The document does not give any notice about evidence of prior incidents of Carrillo's *personal use* of methamphetamine, as opposed to *distribution*. Therefore, the record establishes that the government did not comply with Rule 404(b)'s notice requirement.[5]

Next, the government argues that the testimony at issue was not governed by Rule 404(b) at all, because it is properly classified as "intrinsic" rather than "extrinsic" evidence. However, under our precedents, the testimony was clearly extrinsic evidence. We have explained the distinction between intrinsic and extrinsic evidence as follows:

> To determine whether "other acts" evidence was erroneously admitted, we must first decide whether the evidence was intrinsic or extrinsic. "'Other act' evidence is 'intrinsic' when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990). Intrinsic evidence is admissible to "complete the story of the crime by proving the immediate context of events in time and place," *United States v. Coleman*, 78 F.3d 154, 156 (5th Cir. 1996), and to "evaluate all of the circumstances under which the defendant acted," *United States v. Randall*, 887 F.2d 1262, 1268 (5th Cir.1989). Intrinsic evidence does not implicate rule 404(b), and "consideration

---

[5] The government does not claim that the district court "excuse[d] pretrial notice on good cause shown," as permitted by the rule. Fed. R. Evid. 404(b).

of its admissibility pursuant to [that rule] is unnecessary." *United States v. Garcia*, 27 F.3d 1009, 1014 (5th Cir. 1994).

*United States v. Rice*, 607 F.3d 133, 141 (5th Cir.) (alteration in original), *cert. denied*, 131 S. Ct. 356 (2010).

The evidence at issue here — Lara's testimony describing personal use of methamphetamine by Carrillo, Lara, and Rodriguez in July and August 2009 — was not "inextricably intertwined" with the evidence of Carrillo's charged crime — possession with intent to distribute methamphetamine in September 2009. Neither was it "part of a single criminal episode" with the crime charged; nor was it relevant to "the immediate context of events in time and place" or to "the circumstances under which the defendant acted." *Compare Rice*, 607 F.3d at 141 (evidence of various other offenses committed on the same night as the charged offense was intrinsic because it "helped the government to paint the picture of a group committed to robbing someone that night and to explain how and why they decided to victimize [the victim]"), *Coleman*, 78 F.3d at 156-57 (evidence of previous car-jacking attempt on same night was intrinsic because it helped the government prove facts about the defendant's participation in the carjacking for which the defendant was charged, which allegedly occurred several hours later), *and Garcia*, 27 F.3d at 1014 (small amount of marijuana, which was found in the defendant's home within a few weeks after alleged conspiracy to distribute marijuana from that same home had already occurred, was intrinsic because "[a] jury could reasonably infer that the marihuana in [the defendant's] bedroom was part of larger loads of marihuana brought to his house for distribution"), *with Williams*, 900 F.2d at 825 (mailings sent at different times were extrinsic evidence because they "were distinct and distinguishable events none of which constituted a necessary preliminary for another"). Therefore, Lara's testimony about smoking methamphetamine with Carrillo and Rodriguez in July and August 2009 was clearly extrinsic rather than intrinsic evidence.

No. 10-50243

Because this evidence was extrinsic, Rule 404(b) applied. Even if the testimony otherwise satisfied Rule 404(b)'s requirements for admissibility, the government was still required to comply with the notice requirement. Given the government's failure to meet that requirement, we conclude that the district court abused its discretion by allowing Lara to testify about smoking methamphetamine with Carrillo and Rodriguez in July and August 2009.

However, this issue is subject to harmless error analysis. There was strong evidence of Carrillo's guilt — including his detailed confession, which was recorded and played for the jury. Moreover, the district court gave a limiting instruction, which stated, inter alia, "You must not consider this evidence in deciding if either Mr. Carrillo or Ms. Rodriguez committed the acts set forth in the indictment." We think it is extremely unlikely that Lara's testimony about smoking methamphetamine with Carrillo and Rodriguez in July and August 2009 had any effect on the jury's decision to find Carrillo guilty of possessing methamphetamine with the intent to distribute it in September 2009. We therefore conclude that the government has shown that the error was harmless beyond a reasonable doubt.

## V.

Carrillo also argues that the district court erred by admitting evidence establishing that he had previously been convicted of "the offense of delivery of a controlled substance, cocaine, 4 grams or more but less than 200 grams" by a Texas court in 2005. This was clearly "evidence of other crimes, wrongs, or acts" governed by Rule 404(b). Carrillo does not claim that the government failed to provide notice that it would introduce the prior conviction, but he does argue that the prior conviction was inadmissible because it was introduced only for the illegitimate purpose of showing his bad character and propensity toward dealing in illegal drugs. Rule 404(b) states, in relevant part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to

show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ."

As noted above, we review this issue under a "heightened" abuse of discretion standard, subject to harmless error analysis.  *Templeton*, 624 F.3d at 221.  "Evidence of prior offenses is admissible if 'it is (1) relevant to an issue other than the defendant's character, and (2) the incremental probative value of the evidence is not substantially outweighed by the danger of unfair prejudice to the defendant.'"  *United States v. Pompa*, 434 F.3d 800, 805 (5th Cir. 2005) (quoting *United States v. Thomas*, 348 F.3d 78, 86 (5th Cir. 2003)).

By pleading not guilty to possession with intent to distribute methamphetamine, Carrillo put his intent and knowledge at issue.  *See United States v. Olguin*, 643 F.3d 384, 390 (5th Cir. 2011) ("A defendant's not-guilty plea intuitively puts his intent and knowledge into issue."), *cert. denied by Ledesema v. U.S.*, 2011 WL 3921408 (Oct. 11, 2011) *and by Olguin v. U.S.*, 2011 WL 4051403 (Oct. 11, 2011); *McCall*, 553 F.3d at 828 ("By pleading not guilty to the charges and requiring the government to prove the elements of its case, McCall made evidence of his general intent relevant.").[6]  The government asserts that the prior conviction was admissible under Rule 404(b) to show Carrillo's knowledge and intent.  However, Carrillo's conviction for delivery of cocaine in 2005 arguably had no legitimate relevance to either his knowledge of

---

[6] In *McCall*, we also found it significant that "McCall had not offered 'enforceable pre-trial assurances that he intend[ed] not to dispute criminal intent.'" 553 F.3d at 828 (alteration in original) (quoting *United States v. Webb*, 625 F.2d 709, 710 (5th Cir. 1980)).  And in *United States v. Beechum*, 582 F.3d 898 (5th Cir. 1978) (en banc), we observed that "[i]f the defendant's intent is not contested, then the incremental probative value of the extrinsic offense is inconsequential when compared to its prejudice; therefore, in this circumstance the evidence is uniformly excluded." *Id.* at 914.  In this case, Carrillo does not assert on appeal that he offered any kind of "enforceable pre-trial assurances" or any stipulation or concession regarding his intent; therefore, his intent and knowledge were elements that the government had to prove at trial.

No. 10-50243

methamphetamine or his intent to distribute methamphetamine in 2009. Carrillo's prior conviction did little, if anything, to establish a relevant fact other than Carrillo's bad character or propensity toward selling illegal drugs.[7] Further, it is doubtful whether the prior conviction's incremental probative value, if any, was outweighed by the danger of unfair prejudice to Carrillo. *See Pompa*, 434 F.3d at 805.

Without deciding whether the district court abused its discretion by admitting the prior offense, we conclude that the error, if any, was harmless. The district court gave a limiting instruction regarding the prior offense, telling the jury, inter alia, that "[y]ou must not consider the evidence of this conviction in deciding if Mr. Carrillo committed the act charged in the indictment." As noted, there was strong evidence of Carrillo's guilt, including his confession. Therefore, we believe that the government has met its burden to show that if the admission of the prior conviction was error, it was harmless beyond a reasonable doubt.

## VI.

Finally, Carrillo argues that the district court should not have completely prohibited him from consuming alcohol as a condition of his supervised release. Carrillo did not object to the imposition of this condition below, so we review this issue only for plain error. Under that standard of review, "[t]here must be 'error'

---

[7] The Supreme Court has explained the reasons why propensity evidence is inadmissible under Rule 404(b) as follows:

> The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge.

*Old Chief v. United States*, 519 U.S. 172, 181 (1997) (quoting *Michelson v. United States*, 335 U.S. 469, 475-76 (1948)).

that is 'plain' and that affects 'substantial rights,' and even then we have discretion not to correct the error unless it 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Phipps*, 319 F.3d 177, 189 (5th Cir. 2003) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

"A district court has wide discretion in imposing terms and conditions of supervised release. However, this discretion is limited by 18 U.S.C. § 3583(d), which provides that a court may impose special conditions of supervised release only when the conditions meet certain criteria." *United States v. Paul*, 274 F.3d 155, 164 (5th Cir. 2001). "[S]pecial conditions of supervised release must be reasonably related to the factors set forth in [18 U.S.C.] § 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D)." *Id.* at 164-65 (citing 18 U.S.C. § 3583(d)). "These factors include: (1) 'the nature and circumstances of the offense and the history and characteristics of the defendant,' (2) the need 'to afford adequate deterrence to criminal conduct,' (3) the need 'to protect the public from further crimes of the defendant,' and (4) the need 'to provide the defendant with needed [training], medical care, or other correctional treatment in the most effective manner.'" *Id.* at 165 (alteration in original) (quoting 18 U.S.C. § 3553(a)(1)-(2)). "In addition, supervised release conditions cannot involve a greater deprivation of liberty than is reasonably necessary to achieve the latter three statutory goals." *Id.* (citing 18 U.S.C.
§ 3583(d)).

Carrillo argues that the district court should not have imposed the alcohol prohibition condition because it is a greater deprivation of liberty than is reasonably necessary to achieve the statutory goals as stated above. The Eighth Circuit has held that a district court abused its discretion by imposing a complete ban on consuming alcohol as a condition of supervised release, where the defendant had been convicted of conspiring to distribute crack cocaine and

had no history of alcohol abuse. *United States v. Bass*, 121 F.3d 1218, 1223-25 (8th Cir. 1997). However, the government argues that the alcohol prohibition condition in the present case was a valid exercise of the district court's discretion because the presentence report shows, inter alia, that (1) Carrillo regularly used methamphetamine from 2003 until his arrest in 2009; (2) Carrillo was convicted in 1998 of consuming alcohol while he was a minor; and (3) in 2005, Carrillo was stopped by a police officer who observed him driving a vehicle recklessly, and the officer further observed two open containers of beer in the cup holders between the vehicle's front seats.

We need not decide whether, on these facts, the district court abused its discretion by prohibiting Carrillo from consuming alcohol as a condition of supervised release. We conclude only that if the district court made an error, it was not clear or obvious enough to amount to plain error. *See Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009) ("[T]he legal error must be clear or obvious, rather than subject to reasonable dispute."). Therefore, the supervised release condition survives plain error review.

For the foregoing reasons, we AFFIRM Carrillo's conviction and sentence.