# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 8, 2013

No. 12-20044

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

JAMES RAMEY, also known as James Maceo Ramey, also known as James Maceo Ramey, II, also known as Jim Ramey, also known as Henry Ramey, also known as John Shuler, also known as Joe Hill, also known as Frank Bartuka,

Defendant-Appellant

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:08-CR-502-1

Before KING, HIGGINBOTHAM, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

A jury convicted James Ramey of conspiring to commit bankruptcy fraud, concealing assets, making false oaths, and committing mail fraud. He appeals, alleging that the district court committed various constitutional and evidentiary errors. Finding no reversible error, we AFFIRM the district court's judgment.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-20044

## I. FACTUAL AND PROCEDURAL BACKGROUND

On May 12, 2010, James Ramey was charged in a twenty-five count superseding indictment with committing bankruptcy fraud in violation of 18 U.S.C. § 157(1); concealing assets in violation of 18 U.S.C. § 152(1); making false oaths in violation of 18 U.S.C. § 152(2) and (3); and committing mail fraud in violation of 18 U.S.C. § 1341. The charges arose in connection with various schemes Ramey engineered after business setbacks prevented him from making mortgage payments on various properties he owned. In an effort to stop creditors from foreclosing on these properties, Ramey filed for bankruptcy in 2001. Over the next few years, Ramey—aided by his daughter, Yashare—became a serial bankruptcy filer, filing at least fourteen bankruptcy petitions across numerous states and in various courts. The purpose of these successive filings was to take advantage of the associated automatic stays, which essentially enjoined creditors from commencing or continuing any actions against Ramey until the creditors petitioned to have the stays lifted. Once that occurred, Ramey simply would file another bankruptcy petition to generate a new stay.

Acting at Ramey's behest, Yashare completed most of the bankruptcy forms and signed the majority of the petitions with the name of her father, mother, or mentally challenged brother. Despite declaring under penalty of perjury that the statements in the bankruptcy documents were true and correct, Yashare followed her father's instructions to intentionally incorporate various errors or material omissions into the filings, including incorrect or missing social security numbers, and incorrect or missing addresses. At Ramey's direction, Yashare also omitted from the forms any information pertaining to prior or pending bankruptcy petitions, although such information was required. Yashare

2

testified that these serial and erroneous petitions were filed to manipulate the bankruptcy system, create havoc for creditors, and stave off scheduled foreclosures.[1]

On December 9, 2002, a bankruptcy court in Houston ordered Ramey to refrain from filing another bankruptcy petition for sixteen months without the court's approval. Three days later, he filed for bankruptcy in Delaware, using a mailbox address he had obtained falsely to represent that he resided there. Later, in 2003, Ramey also filed bankruptcy petitions in Florida and Oklahoma.

On November 26, 2003, another bankruptcy judge in Houston ordered Ramey not to file another bankruptcy petition without the court's permission. Less than a month later, in response to the court's order that Ramey divulge certain financial information related to several of his bankruptcy petitions, Ramey filed a motion to dismiss the petitions. In that motion, Ramey claimed that he did not file the petitions in question; that the petitions did not have his social security numbers on them; and that, in effect, he was not seeking bankruptcy protection from his creditors. The court denied Ramey's motion after finding his explanations not to be credible.

Notwithstanding the order prohibiting him from filing further bankruptcy petitions without the court's approval, Ramey filed another petition on September 6, 2005, this time in San Antonio. As was his practice, Ramey did not disclose on that petition his prior bankruptcy filings, and he omitted most of the material information required by the form. Once the bankruptcy court in Houston learned of the San Antonio filing, Ramey's case was referred to the federal district court for a criminal contempt hearing.

---

[1] As further discussed *infra*, Yashare testified that she followed her father's instructions because she was "trained and programmed" from an early age to obey Ramey and, had she protested, Ramey would have physically abused her.

No. 12-20044

During the same period in which Ramey was filing these successive bankruptcy petitions, he also was engaged in other fraudulent activities—many of which succeeded as a result of Ramey's creation and use of various shell companies. One such company, Manhattan Gold, purported to offer gold bars and coins for sale via the Internet. The company received between $350,000 and $400,000 from over fifty customers, but never distributed any gold. At trial, the government called several of Ramey's victims, all of whom testified that they had been duped into buying gold as a result of Manhattan Gold's legitimate-looking website. Some of these witnesses also testified that they had been convinced to make purchases after persuasive encounters with the company's "representatives," who were, in fact, Ramey and his family members. Although many of these victims expended tremendous resources to recover their money, their efforts ultimately proved unavailing.

In the course of perpetrating the Manhattan Gold scheme, Ramey also encountered a businessman named Giles Florence who was seeking financing for his own gold mining operations. Ramey, at times operating under the assumed name of "Joe Hill," represented to Florence that he had connections with a bank called Capitol Trust, which could provide $20 million in financing to mine the gold. Ramey also represented that Capitol Trust could provide him with a $2 million loan to buy an interest in the mines. In exchange, Florence granted Manhattan Gold exclusive rights to sell the gold and other metals the mines produced.

At trial, Yashare testified that Ramey became involved with Florence because Ramey wanted access to the gold in Florence's mines. Ramey eventually fabricated a loan authorization letter for Florence from Capitol Trust Bank, but after sending the letter—and despite repeated attempts by Florence to contact Ramey—Ramey never spoke with Florence again. Consequently, Florence lost the opportunity to deal with other potential investors because he had given

Ramey and Manhattan Gold first priority on the mine's yield. Florence also was unable to pursue several mining opportunities as a result of losing credibility with investors to whom he had made representations based on Ramey's false promises.

As a result of these fraudulent schemes, Ramey was indicted for bankruptcy fraud, concealing assets, making false oaths, and committing mail fraud. After pleading not guilty, Ramey was tried by a jury and convicted on all counts. The district court sentenced Ramey to 188 months' imprisonment and 3 years' supervised release, and ordered him to pay restitution in the amount of $777,051.41. Ramey now appeals.

## II. ANALYSIS

Ramey raises four issues on appeal. First, he argues that the district court erred in denying his motion for a mistrial, which Ramey made after the government purportedly violated his Fifth Amendment privilege against self-incrimination. Second, Ramey contends that the court erroneously admitted certain evidence in violation of Federal Rule of Evidence 403, including evidence that he beat Yashare, and evidence concerning the impact the Manhattan Gold scheme had on one of his victims. Third, Ramey submits that, in contravention of Federal Rule of Evidence 404(b), the court improperly admitted extrinsic evidence of prior fraudulent conduct in which he had engaged. Finally, Ramey asserts that the cumulative effect of these errors warrants a new trial. We address each of these contentions in turn.

### A. Mistrial Motion

#### (1) Standard of Review and Applicable Law

We review the district court's denial of a motion for a mistrial for abuse of discretion. *United States v. Valles*, 484 F.3d 745, 756 (5th Cir. 2007). "The decision to declare a mistrial is left to the sound discretion of the judge, but the power ought to be used with the greatest caution, under urgent circumstances,

and for very plain and obvious causes." *Renico v. Lett*, 130 S. Ct. 1855, 1863 (2010) (internal quotation marks and citation omitted). "[A] mistrial is appropriate when there is a high degree of necessity." *United States v. Ebron*, 683 F.3d 105, 128 (5th Cir. 2012).

Ramey moved for a mistrial based on an alleged violation of his Fifth Amendment privilege against self-incrimination. Under the Fifth Amendment, "[a] prosecutor is prohibited from commenting directly or indirectly on a defendant's failure to testify or produce evidence." *United States v. Wharton*, 320 F.3d 526, 538 (5th Cir. 2003); *see also Doyle v. Ohio*, 426 U.S. 610, 618–19 (1976). This prohibition extends to comments elicited by the prosecutor during examination of a witness. *See, e.g.*, *United States v. Shaw*, 701 F.2d 367, 381 (5th Cir. 1983); *United States v. Impson*, 531 F.2d 274, 275–76 (5th Cir. 1976).

To determine if a constitutional violation has occurred, a court must consider whether (1) the prosecutor "manifestly intended" to comment on the defendant's silence, or (2) the language used "was of such [a] character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Rocha*, 916 F.2d 219, 232 (5th Cir. 1990) (citation omitted); *see also United States v. Rochan*, 563 F.2d 1246, 1249 (5th Cir. 1977). A prosecutor does not "manifestly intend" to comment on a defendant's silence if some other explanation for his remark, including mere inadvertence, is equally plausible. *Rochan*, 563 F.2d at 1249. Morever, even if we find that a violation has occurred, "we apply the doctrine of harmless constitutional error by reviewing the record to determine whether the error was harmless beyond a reasonable doubt." *United States v. Moreno*, 185 F.3d 465, 472 (5th Cir. 1999). A curative instruction can "militate against finding a constitutional violation, or become central to the harmless error analysis." *United States v. Ramey*, No. 07–20833, 2008 WL 4582089, at \*2 (5th Cir. Oct. 15, 2008) (*Ramey I*) (unpublished) (quoting *Moreno*, 185 F.3d at 477).

No. 12-20044

**(2) Ramey's Argument**

Ramey asserts that the government manifestly intended to comment on his silence when, at trial, it elicited from FBI Special Agent Benjamin Stone testimony regarding Ramey's non-production of certain documents. The complained-of testimony related to an interview Stone conducted with Ramey during the execution of a search warrant on April 20, 2004. The colloquy between Stone and the prosecutor proceeded as follows:

> Prosecutor: While you were at the address, conducting the search on Dawnbrook, did you have an opportunity to talk with Mr. Ramey?
>
> Stone: I did.
>
> Prosecutor: All right. And before you talked to him, did you advise him of any—of his constitutional rights?
>
> Stone: We did.
>
> Prosecutor: And did he agree to voluntarily talk with you?
>
> Stone: Yes, he did.
>
> Prosecutor: Did he indicate to you how long he had lived at [the address where the search took place]?
>
> Stone: Since 1987.
>
> Prosecutor: Okay. And since 1987?
>
> Stone: Yes, sir.
>
> Prosecutor: Did he indicate what type business he had?
>
> Stone: He—current interests at the time included the acquisition of gold mines, and he had what he called an "interest" in a gold mine.
>
> Prosecutor: Okay. And did you indicate—ask him what interests—where and what interest did he have in a gold mine?
>
> Stone: He wouldn't tell me the name of what it was; but he said he concluded several purchase agreements for gold mines and that he was currently in negotiations for several others in Canada, Alaska, and the contiguous United States.
>
> Prosecutor: And did he provide you any record or documents indicating whether those were legitimate contracts or not?

7

No. 12-20044

Stone: No.

Prosecutor: Did you ask for it?

Stone: I did.

Prosecutor: Did he provide them?

Stone: No, he did not.

At that point, Ramey's attorney objected and requested to approach the bench. The court dismissed the jury, after which a lengthy discussion ensued wherein Ramey's attorney moved for a mistrial. As he does on appeal, Ramey argued that his refusal to produce documents was an invocation of his Fifth Amendment right to silence, and that the government unconstitutionally attempted to elicit testimony about that refusal.

In arguing on appeal that a mistrial was necessary, Ramey further contends that the prosecutor's manifest intent to comment on his silence was evident from the fact that a similar scenario had played out in an earlier prosecution of Ramey. There, in a separate case arising from the government's investigation into Ramey's fraudulent activities, Ramey was tried and convicted of passport fraud and obstruction of justice. *Ramey I*, 2008 WL 4582089, at *1. At trial in *Ramey I*, Stone testified as follows about the April 20, 2004, interview he conducted with Ramey:

> Prosecutor: Now I'm going to ask you a series of questions and I want you to be careful of your answers. All right?
>
> Stone: All right.
>
> Prosecutor: Did you discuss business records with—of Manhattan Gold with Mr. Ramey?
>
> Stone: We asked if he would be willing to provide us with some of those records about Manhattan Gold, and he decided not to.

*Id.* at *3 (emphasis omitted). Although Ramey argued on appeal that this testimony violated his Fifth Amendment privilege, the *Ramey I* court affirmed his conviction, concluding that Stone's statement that investigators "asked

8

Ramey to provide them business records 'but he decided not to' does not violate the Fifth Amendment" because, inasmuch as "the prosecutor actually cautioned Stone to 'be careful of your answers,'" the prosecutor "clearly did not manifestly intend to elicit Stone's response."[2]  *Id.* at \*4.  Despite this holding, Ramey now argues that because the testimony in his second trial largely mirrored the statement elicited from the same witness in *Ramey I*, the government unambiguously demonstrated its manifest intent to comment on his silence.

### (3) Discussion

We question whether these facts unambiguously reflect that the prosecutor manifestly intended to comment on Ramey's invocation of his Fifth Amendment privilege.  In testifying that Ramey did not provide the requested documents, Stone did not state that Ramey refused or declined to do so; rather, when asked if Ramey provided the documents, Stone simply replied, "No, he did not."  It therefore is not clear that the prosecutor manifestly intended to comment on Ramey's silence.

What is clear, however, is that even assuming the prosecutor's inquiry may be viewed as a remark on Ramey's silence, the error was harmless beyond a reasonable doubt.  We reach this conclusion for two reasons.  First, immediately after the court considered Ramey's motion for a mistrial, the jury returned to the courtroom and the judge issued the following curative instruction:

---

[2] The court also held that Stone's statement did not "have the clear effect of drawing attention to the fact that Ramey invoked his right to silence." *Ramey I*, 2008 WL 4582089, at \*4.  In the case at bar, Ramey does not contend that the prosecutor's remarks were of such a character that the jury would naturally and necessarily have taken them to be commentary on Ramey's silence, nor can we conclude that they were.  *See Rocha*, 916 F.2d at 232.  Thus, the only questions presently under consideration are whether the prosecutor manifestly intended to comment on Ramey's silence and, if so, whether the violation was harmless beyond a reasonable doubt.  *See id.*; *see also Moreno*, 185 F.3d at 472.

[B]efore we broke, there was a line of questioning about the agent's discussion with the defendant. I'm going to ask you to disregard that entire line of questions. Place it outside of your mind, and do not refer to it in deliberations.

As we previously have explained, such curative instructions "may militate against finding a constitutional violation, or become central to the harmless error analysis." *Moreno*, 185 F.3d at 474 (internal citation omitted). This is especially true where, as here, the district court's instruction immediately follows a single allegedly improper comment. *See Greer v. Miller*, 483 U.S. 756, 764–65 & n.5 (1987). Accordingly, we conclude that any minimal impact Stone's testimony may have had on the jury was cured by the court's prompt instruction to disregard the statements.

Second, our conclusion that any error committed by the prosecutor was harmless also is supported by the fact that the evidence establishing Ramey's guilt was overwhelming as to all counts. Yashare, a co-conspirator who intimately was involved in Ramey's schemes, provided extensive and damaging testimony about the scope and nature of Ramey's criminal activity. Her testimony was corroborated by other witnesses, including investigators, the bankruptcy panel trustee, and several of Ramey's victims. Equally damning to Ramey were the numerous exhibits the government introduced that implicated Ramey in the crimes. Simply put, the government's case was so strong that any improper statement made by Stone concerning Ramey's non-production of documents was harmless beyond a reasonable doubt.

For the foregoing reasons, we conclude that the district court did not abuse its discretion in denying Ramey's motion for a mistrial.

## B. Rule 403 Challenges

Ramey next argues that the district court erroneously admitted certain evidence in violation of Federal Rule of Evidence 403. In particular, Ramey contends that the court erred by admitting testimony as to his physical abuse of

No. 12-20044

Yashare and the impact of Ramey's crime on a victim of the Manhattan Gold scheme.

### (1)  Standard of Review and Applicable Law

Under Rule 403, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. "The scope of Rule 403 is narrow. Because virtually all evidence is prejudicial, the danger of unfair prejudice must *substantially* outweigh the probative value of the evidence to warrant exclusion." *United States v. El-Mezain*, 664 F.3d 467, 508 (5th Cir. 2011). "Accordingly, our review is especially deferential to the district court, and the appellant must show 'a clear abuse of discretion.'" *Id.* (quoting *United States v. Curtis*, 635 F.3d 704, 716 (5th Cir. 2011)). "Rare is the appellant who can make that showing." *Curtis*, 635 F.3d at 716. Moreover, "[a]ny error in admitting such evidence is subject to harmless error review, and reversal is not required unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction." *United States v. Williams*, 620 F.3d 483, 492 (5th Cir. 2010) (internal quotation marks and citation omitted).

### (2)  Physical Abuse Evidence

Prior to trial, Ramey filed a motion in limine requesting that the district court prohibit the introduction of any evidence about Ramey's physical abuse of Yashare. During a hearing on the motion, defense counsel asserted that the evidence was substantially more prejudicial than probative, while the government argued that Ramey's control over Yashare was highly probative of his own guilt and the value of the evidence therefore outweighed any prejudicial effect. The court ultimately allowed the government to introduce the evidence after holding that the abuse was "part of the story," and that its probative value outweighed the danger of prejudice.

No. 12-20044

The jury subsequently heard testimony from Yashare regarding her complicity in Ramey's fraud and her explanation for her participation. She stated, for example, that she had been "trained and programmed . . . from birth up to 31" to obey her father, and that if she refused, she "would either get a whupping or choked or whatever." Yashare further testified that she "regularly got beat with an electric cord or belt," and that child protective services had removed her from the Ramey home for some period of time.

On appeal, Ramey contends that the court erred under Rule 403 in admitting this evidence. He cites *United States v. Hands*, 184 F.3d 1322 (11th Cir. 1999), for the proposition that evidence of domestic abuse presents an especially grave danger of prejudice. In *Hands*, the defendant ("Hands") was charged with certain drug crimes. *Id.* at 1325. His wife testified on his behalf that during the time period covered in the indictment, she stayed at home full-time and had never witnessed any drug-related activity at the home. *Id.* at 1325–26. Neither the defense nor the prosecution asked her about her relationship with Hands. *Id.* at 1326. Later, Hands took the stand in his own defense, and the prosecutor asked him on cross-examination about his use of certain firearms. *Id.* Hands volunteered that his handgun permit had been revoked, after which the prosecution asked whether he lost his permit as a result of beating his wife. *Id.* Over repeated objections, the district court allowed the government to continue with its line of questioning and, more damningly, also permitted the prosecutor to introduce photographs of Hands's wife taken after the beating. *Id.*

Hands appealed, arguing that the court erred in admitting the "graphic evidence" of his spousal abuse. *Id.* at 1325. The Eleventh Circuit agreed, concluding that under Rule 403, the evidence should not have been admitted. *Id.* at 1328–29. First, the court found that the evidence of spousal abuse had "minimal probative value" because it did nothing to establish whether Hands

12

was guilty of the drug crimes charged in the indictment. *Id.* at 1328. Furthermore, the court held that the domestic violence evidence—particularly the graphic photographs—was highly prejudicial, given its "arresting" nature. *Id.* at 1328–29. After observing that "the prosecution's case was not overwhelming," the court concluded that the error was not harmless and, accordingly, reversed and remanded for a new trial. *Id.* at 1329–35.

Ramey's reliance on *Hands* is misplaced. Unlike in *Hands*, the government did not attempt to introduce during Ramey's trial gruesome photographs of his abuse of Yashare, nor did it attempt to elicit testimony to prove a general point about Ramey's propensity for illegal or improper behavior. To the contrary, the evidence of Ramey's abuse was tailored to its legitimate purpose, which was to demonstrate his control over, and implementation of, the fraudulent activity. Ramey's influence over Yashare thus was highly probative of his own guilt—a conclusion that is especially clear given Ramey's prior argument that, because he had not signed the bankruptcy petitions, he could not be held accountable for them.[3] In short, the evidence of abuse demonstrated that the petitions were filed at Ramey's direction, and that he was the mastermind behind the criminal activity.

We therefore conclude that the evidence of Ramey's abuse of Yashare was not unfairly prejudicial, nor, by extension, was its probative value substantially outweighed by the danger of unfair prejudice. Accordingly, we reject Ramey's assertion that the district court abused its discretion in admitting it.

**(3) "Victim Impact" Statement**

Ramey also maintains that the court erred under Rule 403 in admitting testimony from one of Ramey's victims as to the impact to him of the Manhattan Gold scheme. At the outset, we note that because this objection was not raised

---

[3] Later, Ramey also defended by claiming that he was unaware that his actions—at least as related to the bankruptcy filings—were illegal.

below, our review is for plain error only.[4] *United States v. Ned*, 637 F.3d 562, 570 (5th Cir. 2011). "Plain error review requires four determinations: whether there was error at all; whether it was plain or obvious; whether the defendant has been substantially harmed by the error; and whether this court should exercise its discretion to correct the error in order to prevent a manifest miscarriage of justice." *United States v. Chavez-Hernandez*, 671 F.3d 494, 497 (5th Cir. 2012).

> The complained-of testimony proceeded as follows:
>
> Prosecutor: How did this loss of $52,000 affect you financially?
>
> Defense counsel: Objection, your Honor, relevance.
>
> Court: Your response?
>
> Prosecutor: I beg your pardon?
>
> Court: The objection is relevance. What response do you—
>
> Prosecutor: Well, I think the witness has a right to tell the jury the effect of this loss upon his personal and family finances.
>
> Court: So, it's a victim impact statement in a sense, is that what it is?
>
> Prosecutor: Yes.
>
> Court: Okay. I'm going to allow it. Okay.
>
> Witness: The—the impact was more emotional, and it put a great strain on my relationship.
>
> Prosecutor: On your relationship?
>
> Witness: Excuse me. I'm just—I'm sorry. I tried to forget about this a long time ago. But the impact was really on the relationship between my wife and myself. Because it wasn't just, you know, the money that we had at the time to, you know, so-called money to play with. It was not the money to play with. It was, you know, family money. And, you know, I took it from the joint account and it wasn't an investment account. So—and then I had to talk to my wife

---

[4] In the lower court, Ramey objected to the admission of this evidence on relevance grounds. He does not reiterate his relevance objection on appeal.

and—and it was very hard to explain how I could—you know, could have made that decision without really, you know, consulting with her. And it is really true, you know, it was a big purchase. And I should have, you know, spoken with her. But I was overconfident, you know, even arrogant, you know, might be able to just—and it put—it affected me for, you know, years to come because my wife lost confidence in me and so did I.

Aside from setting forth this colloquy and generally stating his Rule 403 claim, Ramey does nothing to develop his argument that the court plainly erred in admitting this testimony.  As detailed in Part II.A.3, the evidence against Ramey was overwhelming.[5]  Thus, to the extent the court committed error in admitting this testimony, Ramey is unable to show, in any event, that the error substantially harmed him, much less that we must exercise our discretion to correct the error to prevent a manifest miscarriage of justice.  *See id.* Accordingly, we reject Ramey's contention that the district court plainly erred under Rule 403 in admitting this testimony.

## C.  Rule 404(b) Challenges

Ramey also submits that, in violation of Federal Rule of Evidence 404(b), the court on three separate occasions improperly admitted extrinsic evidence of prior fraudulent conduct in which he had engaged.  Two instances pertained to testimony indicating that Ramey had used funds he received for a construction loan for personal expenses rather than building purposes.  In the third instance, the testimony showed that Ramey had received $90,000 from a friend of Yashare for the purchase of certain office equipment, but that Ramey never provided the equipment or returned the money.  Ramey contends that this evidence not only served no legitimate purpose, but also that its admission was improper because, despite his request, the government provided no notice of its intent to introduce Rule 404(b) evidence.

---

[5] For this reason, Ramey's claim would fail even if we reviewed for harmless, rather than plain, error.

15

**(1)  Standard of Review and Applicable Law**

Under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such evidence may be admissible, however, "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). At the request of a criminal defendant, the prosecutor generally must provide, prior to trial, "reasonable notice of the general nature of any [Rule 404(b)] evidence that the prosecutor intends to offer at trial." Fed. R. Evid. 404(b)(2)(A). The government's failure to provide such notice upon proper request "is subject to harmless error analysis." *United States v. Carrillo*, 660 F.3d 914, 928 (5th Cir. 2011).

In determining whether extrinsic evidence is admissible, a court must decide if it "is relevant to an issue other than the defendant's character" and if it "possess[es] probative value that is not substantially outweighed by its undue prejudice." *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc). "We review the admission of evidence under Federal Rule of Evidence 404(b) under a 'heightened' abuse of discretion standard." *Carrillo*, 660 F.3d at 926 (quoting *United States v. Templeton*, 624 F.3d 215, 221 (5th Cir. 2010)). However, the erroneous admission of Rule 404(b) evidence is subject to harmless error review. *Id.* at 927. "Reversal is not required unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction. When the other evidence of guilt is overwhelming, and the error would not have substantially influenced the jury's verdict, the error is harmless." *United States v. Flores*, 640 F.3d 638, 643 (5th Cir. 2011) (internal quotation marks and citation omitted).

**(2)  Discussion**

We address first Ramey's claim that he properly requested, yet did not receive, notice of the prosecutor's intent to introduce Rule 404(b) evidence.  At the outset, we note that because Ramey did not object to the notice issue during trial, our review is for plain error only.  *United States v. Akpan*, 407 F.3d 360, 373 (5th Cir. 2005).

Our review of the record reveals that Ramey is correct in averring that the government did not provide notice of its intent to use Rule 404(b) evidence.  It is less clear, however, whether Ramey properly requested such notice.  On December 15, 2008, Ramey filed a motion for disclosure under Rule 404(b) in connection with the original indictment in this case, which charged both Ramey and Yashare.  That same day, Ramey filed an opposed motion in limine requesting that the district court prohibit the government from introducing extrinsic evidence related to eighteen specific acts, including "loan fraud or grant fraud" and "[a]ny other alleged fraud."  Several months later, Yashare pled guilty, after which the court granted a number of continuances. On May 12, 2010, a superseding indictment was returned charging Ramey only.  Due to further continuances, trial did not commence until July 6, 2010.

After the superseding indictment was returned, Ramey did not refile either his Rule 404(b) request for notice, or his motion in limine.  Nor did Ramey urge the court to rule on the motion, which, by that time, had been filed a year and a half earlier.  Under these circumstances, it is not clear that the district court committed any error—much less error that was either plain or obvious—in allowing the government to introduce Rule 404(b) evidence without notice.

At any rate, even assuming plain error, Ramey is unable to demonstrate that he was substantially harmed by the error.  *See Chavez-Hernandez*, 671 F.3d at 497.  As explained in the advisory committee's notes accompanying Rule 404(b), a principal purpose of the notice requirement is "to reduce surprise."

Fed. R. Evid. 404(b) advisory committee's note.  Here, Ramey's motion in limine requesting that the government be barred from introducing evidence pertaining to "loan fraud or grant fraud" and "[a]ny other alleged fraud" reflects that he already was aware of the potentiality that the government would introduce evidence of the prior fraudulent activities of which he complains.  Moreover, as we already have explained, the evidence against Ramey was overwhelming, and we thus are unconvinced that the government's lack of notice as to its intent to introduce Rule 404(b) evidence—if required in these circumstances—had any effect on Ramey.  Accordingly, we conclude that Ramey's notice claim does not constitute reversible error.

The notice issue aside, Ramey also argues that the testimony concerning his previous misappropriation of a construction loan and the $90,000 he received from Yashare's friend for business purposes was inadmissible under Rule 404(b).  Ramey neglects, however, that evidence of such misconduct is admissible under Rule 404(b)(2) if the evidence "is relevant to an issue other than the defendant's character" and if it "possess[es] probative value that is not substantially outweighed by its undue prejudice."  *Beechum*, 582 F.2d at 911.  Here, the challenged evidence was relevant to Ramey's common scheme of defrauding, and therefore was admissible to show intent, plan, and the absence of mistake.  *See id.* at 911–12; Fed. R. Evid. 404(b)(2).  The probative value of this "other acts" evidence was heightened by its general likeness to the charged offenses and by Ramey's protestations that he lacked criminal intent to commit the charged crimes.  *See Beechum*, 582 F.2d at 915.  Moreover, Ramey advances no serious argument that the probative value of the complained-of evidence was substantially outweighed by its undue prejudice.  As we previously have explained, "[w]hether the extrinsic offense is sufficiently similar in its physical elements so that its probative value is not substantially outweighed by its undue prejudice is a matter within the sound discretion of the trial judge."  *Id.*  On the

facts of this case, we conclude that the district court did not abuse that discretion in admitting evidence pertaining to Ramey's prior fraudulent conduct.

## D. Cumulative Error Allegation

Lastly, Ramey contends that the cumulative effect of the alleged errors discussed above warrants a new trial. "[T]he cumulative error doctrine . . . provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Delgado*, 672 F.3d 320, 343–44 (5th Cir. 2012) (en banc) (alteration and omission in original) (quoting *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998)). Reversal is only required, however, when those cumulative errors "so fatally infect[ed] the trial that they violated the trial's fundamental fairness." *United States v. Fields*, 483 F.3d 313, 362 (5th Cir. 2007) (quoting *United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004)). "We have repeatedly emphasized that the cumulative error doctrine necessitates reversal only in rare instances and have previously stated en banc that 'the possibility of cumulative error is often acknowledged but practically never found persuasive.'" *Delgado*, 672 F.3d at 344 (footnote omitted) (quoting *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992) (en banc)). "Its application is especially uncommon where, as here, the government presents substantial evidence of guilt." *Id.*

A cumulative error claim requires that "we evaluate the number and gravity of the errors in the context of the case as a whole." *United States v. Valencia*, 600 F.3d 389, 429 (5th Cir. 2010). As we have discussed, Ramey has demonstrated, at most, three potential errors: the government's alleged reference to his Fifth Amendment privilege, the introduction of testimony concerning the impact of Ramey's crime on a victim of the Manhattan Gold scheme, and the government's admission of Rule 404(b) evidence in the absence of notice. Even assuming, *arguendo*, that these were errors, given the

substantial evidence of Ramey's guilt adduced at trial, and the relatively inconsequential nature of the errors in the context of the entirety of the case, we are not persuaded that their cumulative effect denied Ramey of a fair trial. *See United States v. Neal*, 27 F.3d 1035, 1051–52 (5th Cir. 1994). Simply put, this is not "the unusual case in which synergistic or repetitive error violate[d]" the trial's fundamental fairness. *Delgado*, 672 F.3d at 344.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.